GANNETT CO., INC. *v.* DePASQUALE, COUNTY COURT
JUDGE OF SENECA COUNTY, N. Y., ET AL.

No. 77–1301.   Argued November 7, 1978—Decided July 2, 1979

STEWART, J., delivered the opinion of the Court, in which BURGER, C. J., and POWELL, REHNQUIST, and STEVENS, JJ., joined. BURGER, C. J., *post*, p. 394, POWELL, J., *post*, p. 397, and REHNQUIST, J., *post*, p. 403, filed concurring opinions. BLACKMUN, J., filed an opinion concurring in part and dissenting in part, in which BRENNAN, WHITE, and MARSHALL, JJ., joined, *post*, p. 406.

*Robert C. Bernius* argued the cause for petitioner. With him on the briefs was *John Stuart Smith.*

*Bernard Kobroff* argued the cause and filed a brief for respondents.*

MR. JUSTICE STEWART delivered the opinion of the Court.

The question presented in this case is whether members of the public have an independent constitutional right to insist upon access to a pretrial judicial proceeding, even though

---

*Briefs of *amici curiae* urging reversal were filed by *David Rudenstine, Bruce J. Ennis,* and *Joel M. Gora* for the American Civil Liberties Union et al.; by *Arthur B. Hanson, Frank M. Northam,* and *Richard M. Schmidt, Jr.,* for the American Newspaper Publishers Association et al.; and by *Anthony F. Essaye* for the Deadline Club, the New York City Chapter of the Society of Professional Journalists, Sigma Delta Chi, et al.

Briefs of *amici curiae* were filed by *E. Barrett Prettyman, Jr.,* and *Erwin Krasnow* for the Reporters Committee for Freedom of the Press et al.; and by *Floyd Abrams* for New York Times Co.

the accused, the prosecutor, and the trial judge all have agreed to the closure of that proceeding in order to assure a fair trial.

## I

Wayne Clapp, aged 42 and residing at Henrietta, a Rochester, N. Y., suburb, disappeared in July 1976. He was last seen on July 16 when, with two male companions, he went out on his boat to fish in Seneca Lake, about 40 miles from Rochester. The two companions returned in the boat the same day and drove away in Clapp's pickup truck. Clapp was not with them. When he failed to return home by July 19, his family reported his absence to the police. An examination of the boat, laced with bulletholes, seemed to indicate that Clapp had met a violent death aboard it. Police then began an intensive search for the two men. They also began lake-dragging operations in an attempt to locate Clapp's body.

The petitioner, Gannett Co., Inc., publishes two Rochester newspapers, the morning Democrat & Chronicle and the evening Times-Union.[1] On July 20, each paper carried its first

---

[1] The Democrat & Chronicle and the Times-Union are published in Rochester, N. Y. Rochester, in Monroe County, is approximately 40 miles from the Seneca County line. The circulation of the newspapers is primarily in Monroe County. There are some subscribers, however, in Seneca County. In 1976, when this case arose, the Democrat & Chronicle had a Seneca County daily circulation of 1,022, giving it a 9.6% share of the market in that county, and a Sunday circulation of 1,532, for a 14.3% share of the market. The Times-Union published only a daily edition and had but one subscriber in Seneca County. American Newspaper Markets, Inc., Circulation '77/'78, pp. 522, 541. The Bureau of the Census estimated Seneca County's 1976 population at 34,000. U. S. Department of Commerce, Bureau of the Census, Current Population Reports, Series P–26, No. 76–32, Population Estimates 3 (Aug. 1977).

The petitioner in 1976 also owned a Rochester, N. Y., television station. And there were other newspapers in Seneca County at that time. See Circulation '77/'78, *supra*, at 522. The record in this case, however, contains no evidence concerning newspaper coverage of Clapp's disappearance

story about Clapp's disappearance. Each reported the few details that were then known and stated that the police were theorizing that Clapp had been shot on his boat and his body dumped overboard. Each stated that the body was missing. The Times-Union mentioned the names of respondents Greathouse and Jones and said that Greathouse "was identified as one of the two companions who accompanied Clapp Friday" on the boat; said that the two were aged 16 and 21, respectively; and noted that the police were seeking the two men and Greathouse's wife, also 16. Accompanying the evening story was a 1959 photograph of Clapp. The report also contained an appeal from the state police for assistance.

Michigan police apprehended Greathouse, Jones, and the woman on July 21. This came about when an interstate bulletin describing Clapp's truck led to their discovery in Jackson County, Mich., by police who observed the truck parked at a local motel. The petitioner's two Rochester papers on July 22 reported the details of the capture. The stories recounted how the Michigan police, after having arrested Jones in a park, used a helicopter and dogs and tracked down Greathouse and the woman in some woods. They recited that Clapp's truck was located near the park.

The stories also stated that Seneca County police theorized that Clapp was shot with his own pistol, robbed, and his body thrown into Seneca Lake. The articles provided background on Clapp's life, sketched the events surrounding his disappearance, and said that New York had issued warrants for the arrest of the three persons. One of the articles reported that the Seneca County District Attorney would seek to extradite the suspects and would attempt to carry through with a homicide prosecution even if Clapp's body were not found. The paper also quoted the prosecutor as stating, however, that

and the subsequent prosecution of respondents Greathouse and Jones other than that which appeared in the Democrat & Chronicle and the Times-Union.

the evidence was still developing and "the case could change." The other story noted that Greathouse and Jones were from Texas and South Carolina, respectively.

Both papers carried stories on July 23. These revealed that Jones, the adult, had waived extradition and that New York police had traveled to Michigan and were questioning the suspects. The articles referred to police speculation that extradition of Greathouse and the woman might involve "legalities" because they were only 16 and considered juveniles in Michigan. The morning story provided details of an interview with the landlady from whom the suspects had rented a room while staying in Seneca County at the time Clapp disappeared. It also noted that Greathouse, according to state police, was on probation in San Antonio, Tex., but that the police did not know the details of his criminal record.

The Democrat & Chronicle carried another story on the morning of July 24. It stated that Greathouse had led the Michigan police to the spot where he had buried a .357 magnum revolver belonging to Clapp and that the gun was being returned to New York with the three suspects. It also stated that the police had found ammunition at the motel where Greathouse and the woman were believed to have stayed before they were arrested. The story repeated the basic facts known about the disappearance of Clapp and the capture of the three suspects in Michigan. It stated that New York police continued to search Seneca Lake for Clapp's body.

On July 25, the Democrat & Chronicle reported that Greathouse and Jones had been arraigned before a Seneca County Magistrate on second-degree murder charges shortly after their arrival from Michigan; that they and the woman also had been arraigned on charges of second-degree grand larceny; that the three had been committed to the Seneca County jail; that all three had "appeared calm" during the court session; and that the Magistrate had read depositions signed by three witnesses, one of whom testified to having heard "five or six

shots" from the lake on the day of the disappearance, just before seeing Clapp's boat "veer sharply" in the water.

Greathouse, Jones, and the woman were indicted by a Seneca County grand jury on August 2. The two men were charged, in several counts, with second-degree murder, robbery, and grand larceny. The woman was indicted on one count of grand larceny. Both the Democrat & Chronicle and the Times-Union on August 3 reported the filing of the indictments. Each story stated that the murder charges specified that the two men had shot Clapp with his own gun, had weighted his body with anchors and tossed it into the lake, and then had made off with Clapp's credit card, gun, and truck. Each reported that the defendants were held without bail, and each again provided background material with details of Clapp's disappearance. The fact that Clapp's body still had not been recovered was mentioned. One report noted that, according to the prosecutor, if the body were not recovered prior to trial, "it will be the first such trial in New York State history." Each paper on that day also carried a brief notice that a memorial service for Clapp would be held that evening in Henrietta. These notices repeated that Greathouse and Jones had been charged with Clapp's murder and that his body had not been recovered.

On August 6, each paper carried a story reporting the details of the arraignments of Greathouse and Jones the day before. The papers stated that both men had pleaded not guilty to all charges. Once again, each story repeated the basic facts of the accusations against the men and noted that the woman was arraigned on a larceny charge. The stories noted that defense attorneys had been given 90 days in which to file pretrial motions.

During this 90-day period, Greathouse and Jones moved to suppress statements made to the police. The ground they asserted was that those statements had been given involun-

tarily.[2]   They also sought to suppress physical evidence seized as fruits of the allegedly involuntary confessions; the primary physical evidence they sought to suppress was the gun to which, as petitioner's newspaper had reported, Greathouse had led the Michigan police.

The motions to suppress came on before Judge DePasquale on November 4.[3]   At this hearing, defense attorneys argued that the unabated buildup of adverse publicity had jeopardized the ability of the defendants to receive a fair trial.   They thus requested that the public and the press be excluded from the hearing.   The District Attorney did not oppose the motion. Although Carol Ritter, a reporter employed by the petitioner, was present in the courtroom, no objection was made at the time of the closure motion.   The trial judge granted the motion.

The next day, however, Ritter wrote a letter to the trial judge asserting a "right to cover this hearing," and requesting that "we . . . be given access to the transcript."   The judge responded later the same day.   He stated that the suppression hearing had concluded and that any decision on immediate release of the transcript had been reserved.   The petitioner then moved the court to set aside its exclusionary order.

---

[2] Under N. Y. Crim. Proc. Law §§ 710.40 and 255.20 (McKinney Supp. 1978), a defendant was required to file in advance of trial any motion to suppress evidence.   The statutes permitted a defendant to make such a motion for the first time during trial only when he did not have a reasonable opportunity to do so prior to trial, or when the State failed to provide notice before trial that it would seek to introduce a confession of the defendant.   §§ 710.30 and 710.40.2.

[3] The hearing on the motion of defendants Greathouse and Jones to suppress their confessions as involuntary was held before trial in accordance with the decision in *People* v. *Huntley*, 15 N. Y. 2d 72, 204 N. E. 2d 179 (1965).   In *Huntley*, the New York Court of Appeals ruled that the separate inquiry into the voluntariness of a confession, required by this Court's decision in *Jackson* v. *Denno*, 378 U. S. 368 (1964), was to be made in a preliminary hearing.   15 N. Y. 2d, at 78, 204 N. E. 2d, at 183.

The trial judge scheduled a hearing on this motion for November 16 after allowing the parties to file briefs. At this proceeding, the trial judge stated that, in his view, the press had a constitutional right of access although he deemed it "unfortunate" that no representative of the petitioner had objected at the time of the closure motion. Despite his acceptance of the existence of this right, however, the judge emphasized that it had to be balanced against the constitutional right of the defendants to a fair trial. After finding on the record that an open suppression hearing would pose a "reasonable probability of prejudice to these defendants," the judge ruled that the interest of the press and the public was outweighed in this case by the defendants' right to a fair trial. The judge thus refused to vacate his exclusion order or grant the petitioner immediate access to a transcript of the pretrial hearing.

The following day, an original proceeding in the nature of prohibition and mandamus, challenging the closure orders on First, Sixth, and Fourteenth Amendment grounds, was commenced by the petitioner in the Supreme Court of the State of New York, Appellate Division, Fourth Department. On December 17, 1976, that court held that the exclusionary orders transgressed the public's vital interest in open judicial proceedings and further constituted an unlawful prior restraint in violation of the First and Fourteenth Amendments. It accordingly vacated the trial court's orders. 55 App. Div. 2d 107, 389 N. Y. S. 2d 719 (1976).

On appeal, the New York Court of Appeals held that the case was technically moot[4] but, because of the critical importance of the issues involved, retained jurisdiction and reached the merits. The court noted that under state law,

[4] Shortly before the entry of judgment by the Appellate Division, both defendants had pleaded guilty to lesser included offenses in satisfaction of the charges against them. Immediately thereafter, a transcript of the suppression hearing was made available to the petitioner.

"[c]riminal trials are presumptively open to the public, including the press," but held that this presumption was overcome in this case because of the danger posed to the defendants' ability to receive a fair trial. Thus, the Court of Appeals upheld the exclusion of the press and the public from the pretrial proceeding. 43 N. Y. 2d 370, 372 N. E. 2d 544 (1977). Because of the significance of the constitutional questions involved, we granted certiorari. 435 U. S. 1006.

## II

We consider, first, the suggestion of mootness, noted and rejected by the New York Court of Appeals. 43 N. Y. 2d, at 376, 372 N. E. 2d, at 547. We conclude that this aspect of the case is governed by *Nebraska Press Assn.* v. *Stuart,* 427 U. S. 539, 546–547, and that the controversy is not moot. The petitioner, of course, has obtained access to the transcript of the suppression hearing. But this Court's jurisdiction is not defeated, *id.,* at 546, "simply because the order attacked has expired, if the underlying dispute between the parties is one 'capable of repetition, yet evading review.' *Southern Pacific Terminal Co.* v. *ICC,* 219 U. S. 498, 515 (1911)." To meet that test, two conditions must be satisfied: "(1) the challenged action was in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there was a reasonable expectation that the same complaining party would be subjected to the same action again." *Weinstein* v. *Bradford,* 423 U. S. 147, 149.

Those conditions have been met. The order closing a pretrial hearing is too short in its duration to permit full review. And to the extent the order has the effect of denying access to the transcript, termination of the underlying criminal proceeding by a guilty plea, as in this case, or by a jury verdict, nearly always will lead to a lifting of the order before appellate review is completed. The order is "by nature short-lived." *Nebraska Press, supra,* at 547. Further, it is reasonably to

be expected that the petitioner, as publisher of two New York newspapers, will be subjected to similar closure orders entered by New York courts in compliance with the judgment of that State's Court of Appeals. We therefore turn to the merits.

### III

This Court has long recognized that adverse publicity can endanger the ability of a defendant to receive a fair trial. *E. g., Sheppard* v. *Maxwell,* 384 U. S. 333; *Irvin* v. *Dowd,* 366 U. S. 717; *Marshall* v. *United States,* 360 U. S. 310. Cf. *Estes* v. *Texas,* 381 U. S. 532. To safeguard the due process rights of the accused, a trial judge has an affirmative constitutional duty to minimize the effects of prejudicial pretrial publicity. *Sheppard* v. *Maxwell, supra.* And because of the Constitution's pervasive concern for these due process rights, a trial judge may surely take protective measures even when they are not strictly and inescapably necessary.

Publicity concerning pretrial suppression hearings such as the one involved in the present case poses special risks of unfairness. The whole purpose of such hearings is to screen out unreliable or illegally obtained evidence and insure that this evidence does not become known to the jury. Cf. *Jackson* v. *Denno,* 378 U. S. 368. Publicity concerning the proceedings at a pretrial hearing, however, could influence public opinion against a defendant and inform potential jurors of inculpatory information wholly inadmissible at the actual trial.

The danger of publicity concerning pretrial suppression hearings is particularly acute, because it may be difficult to measure with any degree of certainty the effects of such publicity on the fairness of the trial. After the commencement of the trial itself, inadmissible prejudicial information about a defendant can be kept from a jury by a variety of means.[5] When such information is publicized during a pre-

[5] In addition to excluding inadmissible evidence, a trial judge may order sequestration of the jury or take any of a variety of protective measures.

trial proceeding, however, it may never be altogether kept from potential jurors. Closure of pretrial proceedings is often one of the most effective methods that a trial judge can employ to attempt to insure that the fairness of a trial will not be jeopardized by the dissemination of such information throughout the community before the trial itself has even begun. Cf. *Rideau* v. *Louisiana,* 373 U. S. 723.[6]

## IV

### A

The Sixth Amendment, applicable to the States through the Fourteenth, surrounds a criminal trial with guarantees such as the rights to notice, confrontation, and compulsory process that have as their overriding purpose the protection of the accused from prosecutorial and judicial abuses.[7] Among the guarantees that the Amendment provides to a person charged with the commission of a criminal offense, and to him alone, is the "right to a speedy and public trial, by an impartial jury." The Constitution nowhere mentions any right of access to a criminal trial on the part of the public; its guar-

---

See *Nebraska Press Assn.* v. *Stuart,* 427 U. S. 539, 562–565; *Sheppard* v. *Maxwell,* 384 U. S. 333, 358–362.

[6] All of this does not mean, of course, that failure to close a pretrial hearing, or take other protective measures to minimize the impact of prejudicial publicity, will warrant the extreme remedy of reversal of a conviction. But it is precisely because reversal is such an extreme remedy, and is employed in only the rarest cases, that our criminal justice system permits, and even encourages, trial judges to be overcautious in ensuring that a defendant will receive a fair trial.

[7] The Sixth Amendment provides:

"In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defence."

antee, like the others enumerated, is personal to the accused. See *Faretta* v. *California,* 422 U. S. 806, 848 ("[T]he specific guarantees of the Sixth Amendment are personal to the accused") (BLACKMUN, J., dissenting).

Our cases have uniformly recognized the public-trial guarantee as one created for the benefit of the defendant. In *In re Oliver,* 333 U. S. 257, this Court held that the secrecy of a criminal contempt trial violated the accused's right to a public trial under the Fourteenth Amendment. The right to a public trial, the Court stated, "has always been recognized as a safeguard against any attempt to employ our courts as instruments of persecution. The knowledge that every criminal trial is subject to contemporaneous review in the forum of public opinion is an effective restraint on possible abuse of judicial power." *Id.,* at 270. In an explanatory footnote, the Court stated that the public-trial guarantee

> ". . . 'is for the protection of all persons accused of crime—the innocently accused, that they may not become the victim of an unjust prosecution, as well as the guilty, that they may be awarded a fair trial—that one rule [as to public trials] must be observed and applied to all.' Frequently quoted is the statement in [1] Cooley, Constitutional Limitations (8th ed. 1927) at 647: 'The requirement of a public trial is for the benefit of the accused; that the public may see he is fairly dealt with and not unjustly condemned, and that the presence of interested spectators may keep his triers keenly alive to a sense of their responsibility and to the importance of their functions . . . .' " *Id.,* at 270 n. 25.[8]

Similarly, in *Estes* v. *Texas, supra,* the Court held that a defendant was deprived of his right to due process of law under the Fourteenth Amendment by the televising and

---

[8] The Court also recognized that while the right to a public trial is guaranteed to an accused, publicity also provides various benefits to the public. 333 U. S., at 270 n. 24.

broadcasting of his trial. In rejecting the claim that the media representatives had a constitutional right to televise the trial, the Court stated that "[t]he purpose of the requirement of a public trial was to guarantee that the accused would be fairly dealt with and not unjustly condemned." 381 U. S., at 538–539. See also *id.*, at 588 ("Thus the right of 'public trial' is not one belonging to the public, but one belonging to the accused, and inhering in the institutional process by which justice is administered") (Harlan, J., concurring); *id.*, at 583 ("[T]he public trial provision of the Sixth Amendment is a 'guarantee to an accused' . . . [and] a necessary component of an accused's right to a fair trial . . .") (Warren, C. J., concurring).

Thus, both the *Oliver* and *Estes* cases recognized that the constitutional guarantee of a public trial is for the benefit of the defendant. There is not the slightest suggestion in either case that there is any correlative right in members of the public to insist upon a public trial.[9]

---

[9] Numerous commentators have also recognized that only a defendant has a right to a public trial under the Sixth Amendment. *E. g.*, Radin, The Right to a Public Trial, 6 Temple L. Q. 381, 392 (1932) (a public right to a public trial "cannot be derived from the Constitution because the Constitution certainly does not mention a public trial as the privilege of the public, but expressly as that of the accused"); Boldt, Should Canon 35 Be Amended?, 41 A. B. A. J. 55, 56 (1955) ("[T]he guarantee of public trial is for the benefit of persons charged with crime . . . . It is significant that the Constitution does *not* say that the public has the right to 'enjoy' or even attend trials. There is nothing in the constitutional language indicating that any individual other than the accused in a criminal trial . . . [has] either a right to attend the trial or to publicity emanating from the trial"); Note, The Right to Attend Criminal Hearings, 78 Colum. L. Rev. 1308, 1321 (1978) (since the Sixth Amendment confers a right to a public trial to the accused, "to elaborate a parallel and possibly adverse public right of access from the public trial guarantee clause strains even flexible constitutional language beyond its proper bounds"); Note, The Right to a Public Trial in Criminal Cases, 41 N. Y. U. L. Rev. 1138, 1156 (1966) ("Despite the importance of the public's *interest*, however, it does not appear that a public *right* is 'so rooted in the traditions and

## B

While the Sixth Amendment guarantees to a defendant in a criminal case the right to a public trial, it does not guarantee the right to compel a private trial. "The ability to waive a constitutional right does not ordinarily carry with it the right to insist upon the opposite of that right." *Singer* v. *United States,* 380 U. S. 24, 34–35.[10] But the issue here is not whether the defendant can compel a private trial.[11] Rather, the issue

conscience of our people as to be ranked as fundamental,' . . . particularly in view of the uncertain status of this right in the majority of the state courts").

See also Powell, The Right to a Fair Trial, 51 A. B. A. J. 534, 538 (1965) ("We must bear in mind that the primary purpose of a public trial and of the media's right as a part of the public to attend and report what occurs there is to protect the accused"); 1 T. Cooley, Constitutional Limitations 647 (8th ed. 1927) ("The requirement of a public trial is for the benefit of the accused . . .").

It appears that before today, only one court, state or federal, has ever held that the Sixth and Fourteenth Amendments confer upon members of the public a right of access to a criminal trial. *United States* v. *Cianfrani,* 573 F. 2d 835 (CA3 1978). The *Cianfrani* case has been criticized for its departure from the plain meaning of the Sixth Amendment. See Note, 78 Colum. L. Rev., at 1321–1322.

[10] In *Faretta* v. *California,* 422 U. S. 806, by contrast, the Court held that the Sixth and Fourteenth Amendments guarantee that an accused has a right to proceed without counsel in a criminal case when he voluntarily and intelligently elects to do so. In reaching this result, the Court relied on the language and structure of the Sixth Amendment which grants to the accused the right to make a defense. As part of this right to make a defense, the Amendment speaks of the "assistance" of counsel, thus contemplating a norm in which the accused, and not a lawyer, is master of his own defense. *Id.,* at 819–820.

[11] The question in this case is not, as the dissenting opinion repeatedly suggests, *post,* at 411, 415, 418, 425, 426, whether the Sixth and Fourteenth Amendments give a defendant the right to compel a secret trial. In this case the defendants, the prosecutor, and the judge all agreed that closure of the pretrial suppression hearing was necessary to protect the defendants' right to a fair trial. Moreover, a transcript of the proceedings was made available to the public. Thus, there is no need to decide the question

is whether members of the public have an enforceable right to a public trial that can be asserted independently of the parties in the litigation.

There can be no blinking the fact that there is a strong societal interest in public trials. Openness in court proceedings may improve the quality of testimony, induce unknown witnesses to come forward with relevant testimony, cause all trial participants to perform their duties more conscientiously, and generally give the public an opportunity to observe the judicial system. *Estes* v. *Texas,* 381 U. S., at 583 (Warren, C. J., concurring). But there is a strong societal interest in other constitutional guarantees extended to the accused as well. The public, for example, has a definite and concrete interest in seeing that justice is swiftly and fairly administered. See *Barker* v. *Wingo,* 407 U. S. 514, 519. Similarly, the public has an interest in having a criminal case heard by a jury, an interest distinct from the defendant's interest in being tried by a jury of his peers. *Patton* v. *United States,* 281 U. S. 276, 312.

Recognition of an independent public interest in the enforcement of Sixth Amendment guarantees is a far cry, however, from the creation of a constitutional right on the part of the public. In an adversary system of criminal justice, the public interest in the administration of justice is protected by the participants in the litigation. Thus, because of the great public interest in jury trials as the preferred mode of fact-finding in criminal cases, a defendant cannot waive a jury trial without the consent of the prosecutor and judge. *Singer* v. *United States, supra,* at 38; *Patton* v. *United States, supra,* at 312. But if the defendant waives his right to a jury trial,

---

framed by the dissenting opinion. If that question were presented, it is clear that the defendant would have no such right. See *Singer* v. *United States,* 380 U. S. 24, 35 ("[A]lthough a defendant can, under some circumstances, waive his constitutional right to a public trial, he has no absolute right to compel a private trial").

and the prosecutor and the judge consent, it could hardly be seriously argued that a member of the public could demand a jury trial because of the societal interest in that mode of fact-finding. Cf. Fed. Rule Crim. Proc. 23 (a) (trials to be by jury unless waived by a defendant, but the court must approve and the prosecution must consent to the waiver). Similarly, while a defendant cannot convert his right to a speedy trial into a right to compel an indefinite postponement, a member of the general public surely has no right to prevent a continuance in order to vindicate the public interest in the efficient administration of justice. In short, our adversary system of criminal justice is premised upon the proposition that the public interest is fully protected by the participants in the litigation.[12]

## V

In arguing that members of the general public have a constitutional right to attend a criminal trial, despite the obvious lack of support for such a right in the structure or text of the Sixth Amendment, the petitioner and *amici* rely on the history of the public-trial guarantee. This history, however, ultimately demonstrates no more than the existence of a common-law rule of open civil and criminal proceedings.

## A

Not many common-law rules have been elevated to the status of constitutional rights. The provisions of our Consti-

---

[12] The Court has recognized that a prosecutor "is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law . . . ." *Berger* v. *United States,* 295 U. S. 78, 88. The responsibility of the prosecutor as a representative of the public surely encompasses a duty to protect the societal interest in an open trial. But this responsibility also requires him to be sensitive to the due process rights of a defendant to a fair trial. *A fortiori,* the trial judge has the same dual obligation.

tution do reflect an incorporation of certain few common-law rules and a rejection of others. The common-law right to a jury trial, for example, is explicitly embodied in the Sixth and Seventh Amendments. The common-law rule that looked upon jurors as interested parties who could give evidence against a defendant[13] was explicitly rejected by the Sixth Amendment provision that a defendant is entitled to be tried by an "impartial jury." But the vast majority of common-law rules were neither made part of the Constitution nor explicitly rejected by it.

Our judicial duty in this case is to determine whether the common-law rule of open proceedings was incorporated, rejected, or left undisturbed by the Sixth Amendment. In pursuing this inquiry, it is important to distinguish between what the Constitution permits and what it requires. It has never been suggested that by phrasing the public-trial guarantee as a right of the accused, the Framers intended to reject the common-law rule of open proceedings. There is no question that the Sixth Amendment permits and even presumes open trials as a norm. But the issue here is whether the Constitution *requires* that a pretrial proceeding such as this one be opened to the public, even though the participants in the litigation agree that it should be closed to protect the defendants' right to a fair trial.[14] The history upon which the petitioner and *amici* rely totally fails to demonstrate that the Framers of the Sixth Amendment intended to create a constitutional right in strangers to attend a pretrial proceeding,

---

[13] Blackstone, for example, stated that it "universally obtains" that if a juror knows of a matter in issue, he may "give his evidence publicly in court." 3 W. Blackstone, Commentaries *375.

[14] Thus, it is not enough to say, in the words of the dissenting opinion, that there is no "evidence that casting the public-trial concept in terms of a right of the accused signaled a departure from the common-law practice," *post*, at 425, and that "there is no indication that the First Congress, in proposing what became the Sixth Amendment, meant to depart from the common-law practice . . . ." *Post*, at 426.

when all that they actually did was to confer upon the accused an explicit right to demand a public trial.[15] In conspicuous contrast with some of the early state constitutions that pro-

_____

[15] An additional problem with the historical analysis of the petitioner and *amici* is that it is equally applicable to civil and criminal cases and therefore proves too much. For many centuries, both civil and criminal trials have traditionally been open to the public. As early as 1685, Sir John Hawles commented that open proceedings were necessary so "that truth may be discovered in civil *as well as* criminal matters" (emphasis added). Remarks upon Mr. Cornish's Trial, 11 How. St. Tr. 455, 460. English commentators also assumed that the common-law rule was that the public could attend civil and criminal trials without distinguishing between the two. *E. g.*, 2 E. Coke, Institutes of the Laws of England 103 (6th ed. 1681) ("all Causes ought to be heard . . . openly in the Kings Courts"); 3 W. Blackstone, Commentaries *372; M. Hale, The History of the Common Law of England 343, 345 (6th ed. 1820); E. Jenks, The Book of English Law 73-74 (6th ed. 1967).

The experience in the American Colonies was analogous. From the beginning, the norm was open trials. Indeed, the 1677 New Jersey Constitution provided that any person could attend a trial whether it was "civil *or* criminal," Concessions and Agreements of West New Jersey (1677), ch. XXIII, quoted in 1 B. Schwartz, The Bill of Rights: A Documentary History 129 (1971) (emphasis added). Similarly, the 1682 and 1776 Pennsylvania Constitutions both provided that *"all* courts shall be open," 1 Schwartz, *supra*, at 140, 271 (emphasis added).

If the existence of a common-law rule were the test for whether there is a Sixth Amendment public right to a public trial, therefore, there would be such a right in civil as well as criminal cases. But the Sixth Amendment does not speak in terms of civil cases at all; by its terms it is limited to providing rights to an accused in criminal cases. In short, there is no principled basis upon which a public right of access to judicial proceedings can be limited to criminal cases if the scope of the right is defined by the common law rather than the text and structure of the Constitution.

Indeed, many of the advantages of public criminal trials are equally applicable in the civil trial context. While the operation of the judicial process in civil cases is often of interest only to the parties in the litigation, this is not always the case. *E. g., Dred Scott* v. *Sandford,* 19 How. 393; *Plessy* v. *Ferguson,* 163 U. S. 537; *Brown* v. *Board of Education,* 347 U. S. 483; *University of California Regents* v. *Bakke,* 438 U. S. 265. Thus, in some civil cases the public interest in access, and the salutary

vided for a public right to open civil and criminal trials,[16] the Sixth Amendment confers the right to a public trial only upon a defendant and only in a criminal case.

## B

But even if the Sixth and Fourteenth Amendments could properly be viewed as embodying the common-law right of the public to attend criminal trials, it would not necessarily follow that the petitioner would have a right of access under the circumstances of this case. For there exists no persuasive evidence that at common law members of the public had any right to attend pretrial proceedings; indeed, there is substantial evidence to the contrary.[17] By the time of the adoption of the Constitution, public trials were clearly associated with the protection of the defendant.[18] And pretrial proceedings,

---

effect of publicity, may be as strong as, or stronger than, in most criminal cases.

[16] See n. 15, *supra*.

[17] Although pretrial suppression hearings were unknown at common law, other preliminary hearings were formalized by statute as early as 1554 and 1555. 1 & 2 Phil. & M., ch. 13 (1554); 2 & 3 Phil. & M., ch. 10 (1555).

[18] After the abolition of the Star Chamber in 1641, defendants in criminal cases began to acquire many of the rights that are presently embodied in the Sixth Amendment. Thus, the accused now had the right to confront witnesses, call witnesses in his own behalf, and generally the right to a fair trial as we now know it. It was during this period that the public trial first became identified as a right of the accused. As one commentator has stated:

"The public trial, although it had always been the custom, acquired new significance. It gave the individual protection against being denied any of his other fundamental rights. A public trial would make it difficult for a judge to abuse a jury or the accused. Any such abuses would cause much public indignation. Thus, it must have seemed implicit that the public trial was as much an essential element of a fair trial as any of the newer conventions." Note, Legal History: Origins of the Public Trial, 35 Ind. L. J. 251, 255 (1960).

It was during this period that we first find defendants demanding a public trial. See, *The Trial of John Lilburne*, 4 How. St. Tr. 1270, 1273

precisely because of the same concern for a fair trial, were never characterized by the same degree of openness as were actual trials.[19]

(1649), in which Lilburne, on trial for treason, referred to a public trial as "the first fundamental liberty of an Englishman." Indeed, the fact that the Framers guaranteed to an accused the right to a public trial in the same Amendment that contains the other fair-trial rights of an accused also suggests that open trials were by then clearly associated with the rights of a defendant.

[19] Even with respect to trials themselves, the tradition of publicity has not been universal. Exclusion of some members of the general public has been upheld, for example, in cases involving violent crimes against minors. *Geise* v. *United States,* 262 F. 2d 151 (CA9 1958). The public has also been temporarily excluded from trials during testimony of certain witnesses. *E. g., Beauchamp* v. *Cahill,* 297 Ky. 505, 180 S. W. 2d 423 (1944) (exclusion justified when children forced to testify to revolting facts); *State* v. *Callahan,* 100 Minn. 63, 110 N. W. 342 (1907) (exclusion justified when embarrassment could prevent effective testimony); *Hogan* v. *State,* 191 Ark. 437, 86 S. W. 2d 931 (1935) (trial judge properly closed trial to spectators during testimony of 10-year-old rape victim); *United States ex rel. Smallwood* v. *LaValle,* 377 F. Supp. 1148 (EDNY), aff'd, 508 F. 2d 837 (1974). Exclusion has also been permitted when the evidence in a case was expected to be obscene. *State* v. *Croak,* 167 La. 92, 118 So. 703 (1928). Finally, trial judges have been given broad discretion to exclude spectators to protect order in their courtrooms. *United States ex rel. Orlando* v. *Fay,* 350 F. 2d 967 (CA2 1965) (exclusion of general public justified after an outburst in court by defendant and his mother).

Approximately half the States also have statutory provisions containing limitations upon public trials. *E. g.,* Ala. Code § 12–21–202 (1975) (public can be excluded in rape cases); Ga. Code § 81–1006 (1978) (public can be excluded where evidence is vulgar); Mass. Gen. Laws Ann., ch. 278, § 16A (West 1972) (general public can be excluded from all trials of designated crimes); Minn. Stat. § 631.04 (1978) (no person under 17 who is not a party shall be present in a criminal trial); Va. Code § 19.2–266 (1975) ("In the trial of all criminal cases . . . the court may, in its discretion, exclude . . . any persons whose presence would impair the conduct of a fair trial . . .").

The petitioner and *amici* appear to argue that since exclusion of members of the public is relatively rare, there must be a constitutional public

Under English common law, the public had no right to attend pretrial proceedings. *E. g.*, E. Jenks, The Book of English Law 75 (6th ed. 1967) ("It must, of course, be remembered, that the principle of publicity only applies to the actual trial of a case, not necessarily to the preliminary or prefatory stages of the proceedings . . ."); F. Maitland, Justice and Police 129 (1885) (The "preliminary examination of accused persons has gradually assumed a very judicial form . . . . The place in which it is held is indeed no 'open court,' the public can be excluded if the magistrate thinks that the ends of justice will thus be best answered . . ."). See also Indictable Offences Act, 11 & 12 Vict., ch. 42, § 19 (1848) (providing that pretrial proceedings should not be deemed an open court and that the public could therefore be excluded); Magistrates' Courts Act, 15 & 16 Geo. 6 & 1 Eliz. 2, ch. 55, § 4 (2) (1952) (same).[20]

---

right to a public trial. This argument, however, confuses the existence of a constitutional right with the common-law tradition of open civil and criminal proceedings. See n. 15, *supra.* This common-law tradition, coupled with the explicit right of the accused to a public trial in criminal cases, fully explains the general prevalence of open trials.

[20] Similarly, the press had no privilege for the reporting of pretrial judicial proceedings under English common law. Thus in the well-known case of *King* v. *Fisher,* 2 Camp. 563, 170 Eng. Rep. 1253 (N. P. 1811), the court forbade the dissemination of information about a pretrial hearing to protect the right of the accused to receive a fair trial. In distinguishing between the privilege accorded the reporting of trials, and the absence of such a privilege of reporting pretrial proceedings, Lord Ellenborough declared:

"If any thing is more important than another in the administration of justice, it is that jurymen should come to the trial of those persons on whose guilt or innocence they are to decide, with minds pure and unprejudiced. . . . Trials at law, fairly reported, although they may occasionally prove injurious to individuals, have been held to be privileged. Let them continue so privileged. . . . But these preliminary examinations have no such privilege. Their only tendency is to prejudge those whom the

Closed pretrial proceedings have been a familiar part of the judicial landscape in this country as well. The original New York Field Code of Criminal Procedure published in 1850, for example, provided that pretrial hearings should be closed to the public "upon the request of a defendant." [21] The explanatory report made clear that this provision was designed to protect defendants from prejudicial pretrial publicity:

> "If the examination must necessarily be public, the consequence may be that the testimony upon the mere preliminary examination will be spread before the community, and a state of opinion created, which, in cases of great public interest, will render it difficult to obtain an unprejudiced jury. The interests of justice require that the case of the defendant should not be prejudged, if it can be avoided; and no one can justly complain, that until he is put upon his trial, the dangers of this prejudgment are obviated." [22]

Indeed, eight of the States that have retained all or part of the

---

law still presumes to be innocent, and to poison the sources of justice." *Id.*, at 570–571, 170 Eng. Rep., at 1255.

See also *King* v. *Parke*, [1903] 2 K. B. 432, 438.

Restrictions of public access and reporting of pretrial proceedings did not involve suppression hearings because such hearings did not exist in early common law. But the rationale for the lack of a public right of access to pretrial judicial proceedings—protection of the right of the accused to a fair trial—is equally applicable to pretrial suppression hearings. Indeed, the entire purpose of a pretrial suppression hearing is to ensure that the accused will not be unfairly convicted by contaminated evidence.

[21] Commissioners on Practice and Pleadings, Code of Criminal Procedure, § 202 (Final Report 1850).

[22] *Id.*, at 94. To protect a defendant's right to a public trial, however, closure could be ordered only at the request of the defendant:

"To guard the rights of the defendant against a secret examination, the section provides that it shall not be conducted in private, unless at his request." *Id.*, at 95.

Field Code have kept the explicit provision relating to closed pretrial hearings.[23]

For these reasons, we hold that members of the public have no constitutional right under the Sixth and Fourteenth Amendments to attend criminal trials.

## VI

The petitioner also argues that members of the press and the public have a right of access to the pretrial hearing by reason of the First and Fourteenth Amendments. In *Pell* v. *Procunier*, 417 U. S. 817, *Saxbe* v. *Washington Post Co.*, 417 U. S. 843, and *Houchins* v. *KQED, Inc.*, 438 U. S. 1, this Court upheld prison regulations that denied to members of the press access to prisons superior to that afforded to the public generally. Some Members of the Court, however, took the position in those cases that the First and Fourteenth Amendments do guarantee to the public in general, or the press in

---

[23] Ariz. Rule Crim. Proc. 9.3; Cal. Penal Code Ann. § 868 (West 1970); Idaho Code § 19–811 (1979); Iowa Code § 761.13 (1973); Mont. Code Ann. § 46–10–201 (1978); Nev. Rev. Stat. § 171.204 (1975); N. D. Cent. Code § 29–07–14 (1974); Utah Code Ann. § 77–15–13 (1978). Other States have similar provisions. *E. g.*, Pa. Rule Crim. Proc. 323 (f) (providing that suppression hearings shall be open "unless defendant moves that it be held in the presence of only the defendant, counsel for the parties, court officers and necessary witnesses"). Still other States allow closure of pretrial hearings without statutory authorization. *Nebraska Press Assn.* v. *Stuart*, 427 U. S., at 568.

Until a year ago, the American Bar Association also endorsed the view that presiding officers should close pretrial hearings at the request of a defendant unless there was no "substantial likelihood" that the defendant would be prejudiced by an open proceeding. ABA Project on Standards for Criminal Justice, Fair Trial and Free Press § 3.1 (App. Draft 1968). The ABA, following the "approach taken by the Supreme Court in *Nebraska Press Association* v. *Stuart*," has now changed this standard. ABA Project on Standards for Criminal Justice, Fair Trial and Free Press, Standard 8–3.2, p. 16 (App. Draft 1978). The *Nebraska Press* case, however, is irrelevant to the question presented here. See n. 25, *infra*.

particular, a right of access that precludes their complete exclusion in the absence of a significant governmental interest. See *Saxbe, supra,* at 850 (POWELL, J., dissenting); *Houchins, supra,* at 19 (STEVENS, J., dissenting). See also *id.,* at 16 (STEWART, J., concurring).

The petitioner in this case urges us to narrow our rulings in *Pell, Saxbe,* and *Houchins* at least to the extent of recognizing a First and Fourteenth Amendment right to attend criminal trials.[24] We need not decide in the abstract, however, whether there is any such constitutional right. For even assuming, *arguendo,* that the First and Fourteenth Amendments may guarantee such access in some situations, a question we do not decide, this putative right was given all appropriate deference by the state *nisi prius* court in the present case.

Several factors lead to the conclusion that the actions of the trial judge here were consistent with any right of access the petitioner may have had under the First and Fourteenth Amendments. First, none of the spectators present in the courtroom, including the reporter employed by the petitioner, objected when the defendants made the closure motion. Despite this failure to make a contemporaneous objection, counsel for the petitioner was given an opportunity to be heard at a proceeding where he was allowed to voice the petitioner's objections to closure of the pretrial hearing. At this proceeding, which took place after the filing of briefs, the trial court balanced the "constitutional rights of the press and the public" against the "defendants' right to a fair trial." The trial judge concluded after making this appraisal that the press and the public could be excluded from the suppression hearing and could be denied immediate access to a transcript,

---

[24] The petitioner argues that trials have traditionally been open to the public, in contrast to prisons from which the public has been traditionally excluded. We need not decide in this case whether this factual difference is of any constitutional significance.

because an open proceeding would pose a "reasonable probability of prejudice to these defendants." Thus, the trial court found that the representatives of the press did have a right of access of constitutional dimension, but held, under the circumstances of this case, that this right was outweighed by the defendants' right to a fair trial. In short, the closure decision was based "on an assessment of the competing societal interests involved . . . rather than on any determination that First Amendment freedoms were not implicated." *Saxbe, supra,* at 860 (POWELL, J., dissenting).

Furthermore, any denial of access in this case was not absolute but only temporary. Once the danger of prejudice had dissipated, a transcript of the suppression hearing was made available. The press and the public then had a full opportunity to scrutinize the suppression hearing. Unlike the case of an absolute ban on access, therefore, the press here had the opportunity to inform the public of the details of the pretrial hearing accurately and completely. Under these circumstances, any First and Fourteenth Amendment right of the petitioner to attend a criminal trial was not violated.[25]

## VII

We certainly do not disparage the general desirability of open judicial proceedings. But we are not asked here to de-

---

[25] This Court's decision in *Nebraska Press Assn.* v. *Stuart, supra,* is of no assistance to the petitioner in this case. The *Nebraska Press* case involved a direct prior restraint imposed by a trial judge on the members of the press, prohibiting them from disseminating information about a criminal trial. Since "it has been generally, if not universally, considered that it is the chief purpose of the [First Amendment's] guaranty to prevent previous restraints upon publication," *Near* v. *Minnesota ex rel. Olson,* 283 U. S. 697, 713, the Court held that the order violated the constitutional guarantee of a free press. See also *Oklahoma Publishing Co.* v. *District Court,* 430 U. S. 308. The exclusion order in the present case, by contrast, did not prevent the petitioner from publishing any information in its possession. The proper inquiry, therefore, is whether the petitioner was denied any constitutional right of access.

clare whether open proceedings represent beneficial social policy, or whether there would be a constitutional barrier to a state law that imposed a stricter standard of closure than the one here employed by the New York courts. Rather, we are asked to hold that the Constitution itself gave the petitioner an affirmative right of access to this pretrial proceeding, even though all the participants in the litigation agreed that it should be closed to protect the fair-trial rights of the defendants.

For all of the reasons discussed in this opinion, we hold that the Constitution provides no such right. Accordingly, the judgment of the New York Court of Appeals is affirmed.

*Is is so ordered.*

MR. CHIEF JUSTICE BURGER, concurring.

I join the opinion of the Court, but I write separately to emphasize my view of the nature of the proceeding involved in today's decision. By definition, a hearing on a motion before trial to suppress evidence is not a *trial;* it is a *pre*trial hearing.

The Sixth Amendment tells us that "[i]n all criminal prosecutions, the *accused* shall enjoy the right to a . . . public trial." (Emphasis supplied.) It is the practice in Western societies, and has been part of the common-law tradition for centuries, that trials generally be public. This is an important prophylaxis of the system of justice that constitutes the adhesive element of our society. The public has an interest in observing the performance not only of the litigants and the witnesses, but also of the advocates and the presiding judge. Similarly, if the accused testifies, there is a proper public interest in that testimony. But interest alone does not create a constitutional right.

At common law there was a very different presumption for proceedings which preceded the trial. There was awareness of the untoward effects that could result from the publication

of information before an indictment was returned or before a person was bound over for trial. For an example we need only consider the case of *Daubney* v. *Cooper*, 5 M. & R. 314 (K. B. 1829), which involved a suit for trespass against a judge for forcing a person out of a courtroom. The argument concentrated on whether a defendant was entitled to be represented by counsel. But the following exchange on appeal illustrates the distinction drawn between trials and *pre*trial proceedings:

> (Counsel) ". . . The decision in *Cox* v. *Coleridge* proceeded on the ground that what had taken place before the magistrates, was merely a preliminary inquiry. The decision proceeded entirely upon that ground. The Court pointed out the inconvenience which would result from giving *publicity* to such previous inquiry."
>
> Bayley, J. (interrupting) ". . . I believe that in that case a distinction was taken between a *preliminary* inquiry and an inquiry upon which there may be a *conviction*."
>
> (Counsel continued) ". . . Lord *Tenterden* there says, 'This being only a *preliminary* inquiry and not a *trial*, makes, in my mind, *all the difference.*' "\* (Emphasis in original.)
>
> Parke, J. (interrupting) ". . . The decision in *Cox* v. *Coleridge* turned upon its being a case of preliminary inquiry." *Id.*, at 316, 318.

In sum, at common law, the courts recognized that the timing of a proceeding was likely to be critical.

When the Sixth Amendment was written, and for more than

---

\*The full quotation was: "It [the proceeding] is only a preliminary inquiry, whether there be sufficient ground to commit the prisoner for trial. The proceeding before the grand jury is precisely of the same nature, and it would be difficult, if the right exists in the present case, to deny it in that. This being only a preliminary inquiry, and not a trial, makes, in my mind, all the difference." *Cox* v. *Coleridge*, 1 B. & C. 37, 49–50, 107 Eng. Rep. 15, 19–20 (1822).

a century after that, no one could have conceived that the exclusionary rule and pretrial motions to suppress evidence would be part of our criminal jurisprudence. The authors of the Constitution, imaginative, farsighted, and perceptive as they were, could not conceivably have anticipated the paradox inherent in a judge-made rule of evidence that excludes undoubted truth from the truthfinding processes of the adversary system. Nevertheless, as of now, we are confronted not with a legal theory but with the reality of the unique strictures of the exclusionary rule, and they must be taken into account in this setting. To make public the evidence developed in a motion to suppress evidence, cf. *Brewer* v. *Williams*, 430 U. S. 387 (1977), would, so long as the exclusionary rule is not modified, introduce a new dimension to the problem of conducting fair trials.

Even though the draftsmen of the Constitution could not anticipate the 20th-century pretrial proceedings to suppress evidence, pretrial proceedings were not wholly unknown in that day. Written interrogatories were used pretrial in 18th-century litigation, especially in admiralty cases. Thus, it is safe to assume that those lawyers who drafted the Sixth Amendment were not unaware that some testimony was likely to be recorded before trials took place. Yet, no one ever suggested that there was any "right" of the public to be present at such pretrial proceedings as were available in that time; until the trial it could not be known whether and to what extent the pretrial evidence would be offered or received.

Similarly, during the last 40 years in which the pretrial processes have been enormously expanded, it has never occurred to anyone, so far as I am aware, that a pretrial deposition or pretrial interrogatories were other than wholly private to the litigants. A pretrial deposition does not become part of a "trial" until and unless the contents of the deposition are offered in evidence. Pretrial depositions are not uncommon to take the testimony of a witness, either for the defense or

for the prosecution. In the entire pretrial period, there is no certainty that a trial will take place. Something in the neighborhood of 85 percent of all criminal charges are resolved by guilty pleas, frequently after pretrial depositions have been taken or motions to suppress evidence have been ruled upon.

For me, the essence of all of this is that by definition "pretrial proceedings" are exactly that.

MR. JUSTICE POWELL, concurring.

Although I join the opinion of the Court, I would address the question that it reserves. Because of the importance of the public's having accurate information concerning the operation of its criminal justice system, I would hold explicitly that petitioner's reporter had an interest protected by the First and Fourteenth Amendments in being present at the pretrial suppression hearing.[1] As I have argued in *Saxbe* v. *Washington Post Co.*, 417 U. S. 843, 850 (1974) (POWELL, J., dissenting), this constitutional protection derives, not from any special status of members of the press as such, but rather

---

[1] In the present case, members of the press and public were excluded from a pretrial suppression hearing, rather than from the trial itself. In our criminal justice system as it has developed, suppression hearings often are as important as the trial which may follow. The government's case may turn upon the confession or other evidence that the defendant seeks to suppress, and the trial court's ruling on such evidence may determine the outcome of the case. Indeed, in this case there was no trial as, following the suppression hearing, plea bargaining occurred that resulted in guilty pleas. In view of the special significance of a suppression hearing, the public's interest in this proceeding often is comparable to its interest in the trial itself. It is to be emphasized, however, that not all of the incidents of pretrial and trial are comparable in terms of public interest and importance to a formal hearing in which the question is whether critical, if not conclusive, evidence is to be admitted or excluded. In the criminal process, there may be numerous arguments, consultations, and decisions, as well as depositions and interrogatories, that are not central to the process and that implicate no First Amendment rights. And, of course, grand jury proceedings traditionally have been held in strict confidence. See *Houchins* v. *KQED, Inc.*, 438 U. S. 1, 34–35 (1978) (STEVENS, J., dissenting).

because "[i]n seeking out the news the press . . . acts as an agent of the public at large," each individual member of which cannot obtain for himself "the information needed for the intelligent discharge of his political responsibilities." *Id.,* at 863. Cf. *First National Bank of Boston* v. *Bellotti,* 435 U. S. 765, 776–778 (1978).

The right of access to courtroom proceedings, of course, is not absolute. It is limited both by the constitutional right of defendants to a fair trial, see, *e. g., Estes* v. *Texas,* 381 U. S. 532 (1965), and by the needs of government to obtain just convictions and to preserve the confidentiality of sensitive information and the identity of informants. Cf. *Procunier* v. *Martinez,* 416 U. S. 396, 412–413 (1974); *Houchins* v. *KQED, Inc.,* 438 U. S. 1, 34–35 (1978) (STEVENS, J., dissenting); *Saxbe* v. *Washington Post Co., supra,* at 872–873 (dissenting opinion). The task of determining the application of these limitations in each individual trial necessarily falls almost exclusively upon the trial court asked to exclude members of the press and public from the courtroom. For it would be entirely impractical to require criminal proceedings to cease while appellate courts were afforded an opportunity to review a trial court's decision to close proceedings. It is all the more important, therefore, that this Court identify for the guidance of trial courts the constitutional standard by which they are to judge whether closure is justified, and the minimal procedure by which this standard is to be applied.[2]

In cases such as this, where competing constitutional rights must be weighed in the context of a criminal trial,

---

[2] Contrary to MR. JUSTICE REHNQUIST's suggestion, *post,* at 405, lower courts cannot assume after today's decision that they are "free to determine for themselves the question whether to open or close the proceeding" free from all constitutional constraint. For although I disagree with my four dissenting Brethren concerning the origin and the scope of the constitutional limitations on the closing of pretrial proceedings, I agree with their conclusion that there are limitations and that they require the careful attention of trial courts before closure can be ordered.

the often difficult question is whether unrestrained exercise of First Amendment rights poses a serious danger to the fairness of a defendant's trial. "As we stressed in *Estes,* the presence of the press at judicial proceedings must be limited when it is apparent that the accused might otherwise be prejudiced or disadvantaged." *Sheppard* v. *Maxwell,* 384 U. S. 333, 358 (1966) (footnote omitted); see *Estes* v. *Texas, supra,* at 539. In striking this balance there are a number of considerations to be weighed. In *Nebraska Press Assn.* v. *Stuart,* 427 U. S. 539 (1976), we concluded that there is a strong presumption against prohibiting members of the press from publishing information already in their possession concerning courtroom proceedings. Excluding all members of the press from the courtroom, however, differs substantially from the "gag order" at issue in *Nebraska Press,* as the latter involved a classic prior restraint, "one of the most extraordinary remedies known to our jurisprudence," *id.,* at 562, and applied to information irrespective of its source. In the present case, on the other hand, we are confronted with a trial court's order that in effect denies access only to one, albeit important, source. It does not in any way tell the press what it may and may not publish.

Despite these differences between *Nebraska Press* and the present case, petitioner asks the Court to impose a severe burden upon defendants seeking closure. The approach taken in MR. JUSTICE BLACKMUN's opinion would grant this request, limiting closure to those cases where "it is strictly and inescapably necessary in order to protect the fair-trial guarantee." See *post,* at 440. It is difficult to imagine a case where closure could be ordered appropriately under this standard. A rule of such apparent inflexibility could prejudice defendants' rights and disserve society's interest in the fair and prompt disposition of criminal trials. As a result of pretrial publicity, defendants could be convicted after less than the meticulously fair trial that the Constitution demands. There

also could be an increase in reversal of convictions on appeal. In either event, it seems to me that the approach suggested by petitioner would not adequately safeguard the defendant's right to a fair trial, a right of equal constitutional significance to the right of access. The better course would be a more flexible accommodation between First and Sixth Amendment rights which are protected from state-law interference by the Fourteenth Amendment—an accommodation under which neither defendants' rights nor the rights of members of the press and public should be made subordinate. Cf. *Branzburg* v. *Hayes,* 408 U. S. 665, 709–710 (1972) (POWELL, J., concurring). The question for the trial court, therefore, in considering a motion to close a pretrial suppression hearing is whether a fair trial for the defendant is likely to be jeopardized by publicity, if members of the press and public are present and free to report prejudicial evidence that will not be presented to the jury.

Although the strict standard of *Nebraska Press* is not applicable to decisions concerning closure of courtroom proceedings, much of the discussion in that case of the factors to be considered in making decisions with respect to "gag orders" is relevant to closure decisions. Thus, where a defendant requests the trial court to exclude the public, it should consider whether there are alternative means reasonably available by which the fairness of the trial might be preserved without interfering substantially with the public's interest in prompt access to information concerning the administration of justice. Similarly, because exclusion is justified only as a protection of the defendant's right to a fair trial and the State's interest in confidentiality, members of the press and public objecting to the exclusion have the right to demand that it extend no farther than is likely to achieve these goals. Thus, for example, the trial court should not withhold the transcript of closed courtroom proceedings past the time when no prejudice is likely to result to the defendant or the State from its release.

It is not enough, however, that trial courts apply a certain

standard to requests for closure. If the constitutional right of the press and public to access is to have substance, representatives of these groups must be given an opportunity to be heard on the question of their exclusion. But this opportunity extends no farther than the persons actually present at the time the motion for closure is made, for the alternative would require substantial delays in trial and pretrial proceedings while notice was given to the public. Upon timely objection to the granting of the motion, it is incumbent upon the trial court to afford those present a reasonable opportunity to be heard on the question whether the defendant is likely to be deprived of a fair trial if the press and public are permitted to remain in attendance. At this hearing, it is the defendant's responsibility as the moving party to make some showing that the fairness of his trial likely will be prejudiced by public access to the proceedings. Similarly, if the State joins in the closure request, it should be given the opportunity to show that public access would interfere with its interests in fair proceedings or preserving the confidentiality of sensitive information. On the other hand, members of the press and public who object to closure have the responsibility of showing to the court's satisfaction that alternative procedures are available that would eliminate the dangers shown by the defendant and the State.

The question, then, is whether the First Amendment right of access outlined above was adequately respected in the present case. As the Court notes, the reporter ordered from the courtroom upon the motion of the defendants did not object to the closure order until the suppression hearing was all but completed. Petitioner's right to be heard on the question of closure, therefore, was not invoked until the closure was an accomplished and irrevocable fact.[3] Upon

---

[3] Indeed, during subsequent oral argument, the trial court told counsel for petitioner: "It is very unfortunate that you were not here when the [closure] motion was made, but the motion was made and it was made with the moving force behind the motion being the rights of the defendants

petitioner's request, counsel for the newspaper was allowed within a reasonable time after the request to present written and oral arguments to the court challenging its closure order.

At this oral argument, the trial court applied a standard similar to that set forth above. It first reviewed for petitioner's counsel the factual basis for its finding that closure had been necessary to preserve the fairness of the defendants' trial. In the court's view, the nature of the evidence to be considered at the hearing, the young age of two of the defendants, and the extent of the publicity already given the case had indicated that an open hearing would substantially jeopardize the fairness of the defendants' subsequent trial. Moreover, the court emphasized the fact that the prosecutor, as well as each of the defense lawyers, had endorsed the closure motion. On the other hand, the court found that petitioner had not presented any basis for changing the court's views on the need for closure. Throughout oral argument, the court recognized the constitutional right of the press and public to be present at criminal proceedings. It concluded, however, that in the "unique situation" presented to it, closure had been appropriate, and that the seal it had placed upon the transcript of the suppression hearing should continue in effect.[4]

---

to a fair trial." App. 13. "The Gannett newspapers knew that the matter was scheduled for a hearing, they did have an opportunity to have counsel present on that particular morning that the [closure] motion was made, and unfortunately there was no representative of the Gannett newspapers." *Id.*, at 17.

[4] It does not appear from the record that the trial court gave any explicit consideration to the alternatives to closure and the sealing of the transcript. Although generally such consideration is necessary in order to determine whether the Constitution permits closure, see *supra*, at 400, in the circumstances of the present case I cannot find error in the trial court's method of proceeding. Petitioner's counsel, when he appeared after the closure order had been effectuated, suggested only obliquely that the court should consider alternatives such as a change of venue. At oral argument before the court, the lawyer insisted that "there must be a

In my view, the procedure followed by the trial court fully comported with that required by the Constitution. Moreover, the substantive standard applied was essentially correct, and, giving due deference to the proximity of the trial judge to the surrounding circumstances, I cannot conclude that it was error in this case to exclude petitioner's reporter. I therefore agree that the judgment of the New York Court of Appeals must be affirmed.

MR. JUSTICE REHNQUIST, concurring.

While I concur in the opinion of the Court, I write separately to emphasize what should be apparent from the Court's Sixth Amendment holding and to address the First Amendment issue that the Court appears to reserve.

The Court today holds, without qualification, that "members of the public have no constitutional right under the Sixth and Fourteenth Amendments to attend criminal trials." *Ante,* at 391. In this case, the trial judge closed the suppression hearing because he concluded that an open hearing might have posed a danger to the defendants' ability to receive a fair trial. *Ante,* at 376. But the Court's recitation of this fact and its discussion of the need to preserve the defendant's right to a fair trial, *ante,* at 378–379, should not be interpreted to mean that under the Sixth Amendment a trial court can close

---

factual showing that there are no alternative means of remedying that problem [of prejudicial publicity], and the only thing that has been mentioned today . . . is that there is a reasonable probability that the defendants' case would be prejudiced." Insofar as this remark suggested that the burden was on the defendants to prove that there were no alternatives to closure, the court properly rejected the suggestion. See discussion, *supra,* at 401. And it appears that petitioner's counsel, for his part, made no effort to show that any alternative method of proceeding would be satisfactory. In light of the unsettled state of the law confronting the trial court, and the uncertain nature of the claims petitioner was making, I conclude that there was no material deviation from the guidelines set forth above.

a pretrial hearing or trial only when there is a danger that prejudicial publicity will harm the defendant.[1] To the contrary, since the Court holds that the public does not have *any* Sixth Amendment right of access to such proceedings, it necessarily follows that if the parties agree on a closed proceeding, the trial court is not required by the Sixth Amendment to advance any reason whatsoever for declining to open a pretrial hearing or trial to the public. "There is no question that the Sixth Amendment permits and even presumes open trials as a norm." *Ante,* at 385. But, as the Court today holds, the Sixth Amendment does not require a criminal trial or hearing to be opened to the public if the participants to the litigation agree for any reason, no matter how jurisprudentially appealing or unappealing, that it should be closed.

The Court states that it may assume *"arguendo"* that the First and Fourteenth Amendments guarantee the public a right of access to pretrial hearings in some situations, because it concludes that in this case this "putative right was given all appropriate deference." *Ante,* at 392. Despite the Court's seeming reservation of the question whether the First Amendment guarantees the public a right of access to pretrial proceedings, it is clear that this Court repeatedly has held that there is no First Amendment right of access in the public or the press to judicial or other governmental proceedings. See *post,* at 411; *Nixon* v. *Warner Communications, Inc.,* 435 U. S. 589, 609 (1978); *Saxbe* v. *Washington Post Co.,* 417 U. S. 843, 850 (1974); *Pell* v. *Procunier,* 417 U. S. 817, 834 (1974); *Branzburg* v. *Hayes,* 408 U. S. 665, 684–685 (1972); *Zemel* v. *Rusk,* 381 U. S. 1, 16–17 (1965); *Estes* v. *Texas,* 381 U. S. 532,

---

[1] In fact, as both the Court and the dissent recognize, the instances in which pretrial publicity alone, even pervasive and adverse publicity, actually deprives a defendant of the ability to obtain a fair trial will be quite rare. *Ante,* at 379 n. 6; *post,* at 443–444; see *Nebraska Press Assn.* v. *Stuart,* 427 U. S. 539, 551–555 (1976); *Murphy* v. *Florida,* 421 U. S. 794, 798–799 (1975); *Beck* v. *Washington,* 369 U. S. 541, 557 (1962); *Stroble* v. *California,* 343 U. S. 181, 191–194 (1952).

539–540 (1965). See also *Houchins* v. *KQED, Inc.*, 438 U. S. 1, 9–15 (1978) (opinion of BURGER, C. J., joined by WHITE and REHNQUIST, JJ.); *id.*, at 16 (STEWART, J., concurring). "The First and Fourteenth Amendments do not guarantee the public a right of access to information generated or controlled by government, nor do they guarantee the press any basic right of access superior to that of the public generally. The Constitution does no more than assure the public and the press equal access once government has opened its doors." *Ibid.* Thus, this Court emphatically has rejected the proposition advanced in MR. JUSTICE POWELL's concurring opinion, *ante,* at 400–401, that the First Amendment is some sort of constitutional "sunshine law" that requires notice, an opportunity to be heard, and substantial reasons before a governmental proceeding may be closed to the public and press. Because this Court has refused to find a First Amendment right of access in the past, lower courts should not assume that after today's decision they must adhere to the procedures employed by the trial court in this case or to those advanced by MR. JUSTICE POWELL in his separate opinion in order to avoid running afoul of the First Amendment. To the contrary, in my view and, I think, in the view of a majority of this Court, the lower courts are under no constitutional constraint either to accept or reject those procedures. They remain, in the best tradition of our federal system, free to determine for themselves the question whether to open or close the proceeding.[2] Hope-

---

[2] My Brother POWELL suggests in his concurring opinion that I am wrong in so stating. *Ante,* at 398 n. 2. He believes that the four dissenters—who expressly reject his First Amendment views, *post,* at 411, and who, instead, rely on a Sixth Amendment analysis that is repudiated by a majority of the Court today—will join him in any subsequent case to impose constitutional limitations on the ability of a trial court to close judicial proceedings. I disagree with MR. JUSTICE POWELL for two reasons. First, in a matter so commonly arising in the regular administration of criminal justice, I do not so lightly as my Brother POWELL impute to the four dissenters in this case a willingness to ignore the doctrine of *stare*

fully, they will decide the question by accommodating competing interests in a judicious manner. But so far as the Constitution is concerned, the question is for them, not us, to resolve.

MR. JUSTICE BLACKMUN, with whom MR. JUSTICE BRENNAN, MR. JUSTICE WHITE, and MR. JUSTICE MARSHALL join, concurring in part and dissenting in part.

I concur in Part II of the Court's opinion but I dissent from that opinion's subsequent Parts. I also cannot join the Court's phrasing of the "question presented," *ante,* at 370–371, or its distress and concern with the publicity the Clapp murder received in the Seneca County, N. Y., area.

Today's decision, as I view it, is an unfortunate one. I fear that the Court surrenders to the temptation to overstate and overcolor the actual nature of the pre-August 7, 1976, publicity; that it reaches for a strict and flat result; and that in the process it ignores the important antecedents and significant developmental features of the Sixth Amendment. The result is an inflexible *per se* rule, as MR. JUSTICE REHNQUIST so appropriately observes in his separate concurrence, *ante,* at 403–404. That rule is to the effect that if the defense and the prosecution merely agree to have the public excluded from a suppression hearing, and the trial judge does not resist—as trial judges may be prone not to do, since nonresistance is easier than resistance—closure shall take place, and there is nothing in the Sixth Amendment that prevents

--------

*decisis* and to join with him in some later decision to form what might fairly be called an "odd quintuplet," agreeing that the authority of trial courts to close judicial proceedings to the public is subject to limitations stemming from two different sources in the Constitution. But even if this were to occur, the very diversity of views that necessarily would be reflected in any such disposition would seem to me, as a practical matter, to place outside of any limits imposed by the United States Constitution all but the most bizarre orders closing judicial proceedings—the sort of orders which have spawned the saying that "hard cases make bad law."

that happily agreed upon event. The result is that the important interests of the public and the press (as a part of that public) in open judicial proceedings are rejected and cast aside as of little value or significance.

Because I think this easy but wooden approach is without support either in legal history or in the intendment of the Sixth Amendment, I dissent.

I

The Court's review of the facts, *ante,* at 371–377, does not face up to the placid, routine, and innocuous nature of the news articles about the case and, indeed, their comparative infrequency. I attempt to supply what is missing:

The reporting by both newspapers on August 3 of the filing of the indictments was the first time either of the two papers had carried any comment about the case since July 25, nine days before. On August 6, each paper carried a story reporting the arraignments of Greathouse and Jones on the preceding day. Thereafter, no story about the Clapp case appeared in petitioner's papers until the suppression hearing on November 4. Thus, for 90 days preceding that hearing there was *no* publicity whatsoever. From July 20, when the first story appeared, until August 6, a period of 18 days, 14 different articles were printed in the two papers. Because the evening paper usually reprinted or substantially duplicated the morning story, there were articles on only 7 different days during this 18-day period, with the evening story containing little that differed from the morning story on the 5 days that accounts appeared in both papers.

Furthermore, there can be no dispute whatsoever that the stories consisted almost entirely of straightforward reporting of the facts surrounding the investigation of Clapp's disappearance, and of the arrests and charges. The stories contained no "editorializing" and nothing that a fairminded person could describe as sensational journalism. Only one picture appeared; it was a photograph of Clapp that accom-

panied the first story printed by the Times-Union. There is nothing in the record to indicate that the stories were placed on the page or within the paper so as to play up the murder investigation. Headlines were entirely factual. The stories were relatively brief. They appeared only in connection with a development in the investigation, and they gave no indication of being published to sustain popular interest in the case.

The motions to suppress came on before Judge DePasquale on November 4. Despite the absence of any publicity in the newspapers for three months, counsel for both defendants, at the commencement of the hearing and without previously having indicated their intention so to do, asked for the exclusion of all members of the public and press present in the courtroom. They urged as grounds for their motions that "we are going to take evidentiary matters into consideration here that may or may not be brought forth subsequently at a trial." App. 4. After being reminded by the court that the defendants had a constitutional right to a public trial and that such exclusion "does abridge the rights, the constitutional rights, of the defendants," Greathouse's attorney, joined by Jones' lawyer, stated: "I fully understand that, your Honor, but this is not a trial, it is a hearing, and I think the dilatorious [sic] effects far outweigh the constitutional rights." Id., at 5. The court then turned to the District Attorney. The prosecutor indicated that he did not wish to be heard with respect to the motion and said only: "I stated earlier that I thought it was up to the defense, and I would not oppose what they wished to do." Ibid. Thereupon the court, without further inquiry, granted the motion for closure. It said that "it is not the trial of the matter" and that "matters may come up in the testimony of the People's witnesses that may be prejudicial to the defendant." Id., at 6.

We therefore have a situation where the two defense attorneys suddenly and without notice moved that the suppression hearing be closed, and where the prosecutor, obviously taken off guard and having no particularly strong feeling, or any

considered position, acquiesced. The court, to its credit, was sensitive about the rights of the defendants to a public proceeding, even though it thought "it is not the trial of the matter." The court obviously was not impressed with any brooding presence of possible prejudicial publicity. Its comment was only that "evidentiary matters may come up . . . that may be prejudicial." It is difficult to imagine anything less sensational in a murder context.

Yet this is all that the Court possesses to justify its description of the question presented as one in the context of an agreement by the accused, the prosecutor, and the trial judge to have closure "in order to assure a fair trial," *ante,* at 371, and the hearing as one where, *ante,* at 375, "defense attorneys argued that the unabated buildup of adverse publicity had jeopardized the ability of the defendants to receive a fair trial."

I find little in the record that tends to support either of those descriptions of such serious consequence. There is no reference to or inference of an "unabated buildup of adverse publicity." All the defense attorneys spoke of were "the dilatorious effects" of "evidentiary matters . . . that may or may not be brought forth subsequently at a trial." App. 5, 4. MR. JUSTICE REHNQUIST notes this thin concern. *Ante,* at 403–404. The defense lawyers were representing their clients, of course, and perhaps were properly overcautious, but they certainly favored the court with nothing about "unabated buildup of adverse publicity" that must be prevented "in order to assure a fair trial." In fairness to the Court today, its colorful allusions to what it assumes took place when the motions were presented on November 4 may be attributable to comments in the opinion of the majority of the New York Court of Appeals: [1]

   "At the commencement of a pretrial suppression hear-

---

[1] Two of the six judges who heard the case in the New York Court of Appeals dissented. They would have found the order entered by the

ing, defense attorneys argued that an unabated buildup of adverse publicity had already jeopardized their clients' ability to receive a fair trial." 43 N. Y. 2d 370, 375, 372 N. E. 2d 544, 546.

"The details, however, were not known and public curiosity was intense." *Id.*, at 381, 372 N. E. 2d, at 550.

The New York majority went on to rule that the presumption of closure was raised in this case because the public knew that respondents Greathouse and Jones "had been caught 'red-handed' by Michigan police with fruits of the crime," and because it was "widely known" that they "had made incriminating statements before being returned to" New York. *Ibid.*, 372 N. E. 2d, at 550. And the court found that the level of "legitimate public concern" necessary to overcome the presumption of closure had not been demonstrated:

"Widespread public awareness kindled by media saturation does not legitimize mere curiosity. Here the public's concern was not focused on prosecutorial or judicial accountability; irregularities, if any, had occurred out of State. The interest of the public was chiefly one of active curiosity with respect to a notorious local happening." *Ibid.*, 372 N. E. 2d, at 550.

With all respect, it is difficult for me to extract all of that from the casual comments made at the hearing before Judge DePasquale. Cf. *People* v. *Jones*, 47 N. Y. 2d 409, 391 N. E. 2d 1335 (1979).

## II

This Court confronts in this case another aspect of the recurring conflict that arises whenever a defendant in a criminal case asserts that his right to a fair trial clashes with the right of the public in general, and of the press in particular, to an

County Court to be of the type of prior restraint prohibited by *Nebraska Press Assn.* v. *Stuart*, 427 U. S. 539 (1976), and would have affirmed the Appellate Division on the ground that the evidence did not support entry of the order. 43 N. Y. 2d 370, 382, 372 N. E. 2d 544, 551.

open proceeding. It has considered other aspects of the problem in deciding whether publicity was sufficiently prejudicial to have deprived the defendant of a fair trial. Compare *Murphy v. Florida,* 421 U. S. 794 (1975), with *Sheppard* v. *Maxwell,* 384 U. S. 333 (1966). And recently it examined the extent to which the First and Fourteenth Amendments protect news organizations' rights to publish, free from prior restraint, information learned in open court during a pretrial suppression hearing. *Nebraska Press Assn.* v. *Stuart,* 427 U. S. 539 (1976). But the Court has not yet addressed the precise issue raised by this case: whether and to what extent the Constitution prohibits the States from excluding, at the request of a defendant, members of the public from such a hearing. See *id.,* at 564 n. 8; *id.,* at 584 n. 11 (BRENNAN, J., concurring in judgment); *Times-Picayune Publishing Corp.* v. *Schulingkamp,* 419 U. S. 1301, 1308 n. 3 (1974) (POWELL, J., in chambers).

It is clear that this case does not involve the type of prior restraint that was in issue in cases like *Nebraska Press.* Neither the County Court nor the Court of Appeals restrained publication of, or comment upon, information already known to the public or the press, or about the case in general. The issue here, then, is not one of prior restraint on the press but is, rather, one of *access* to a judicial proceeding.

Despite MR. JUSTICE POWELL's concern, *ante,* p. 397, this Court heretofore has not found, and does not today find, any First Amendment right of access to judicial or other governmental proceedings. See, *e. g., Nixon* v. *Warner Communications, Inc.,* 435 U. S. 589, 608–610 (1978); *Pell* v. *Procunier,* 417 U. S. 817, 834 (1974). One turns then, instead, to that provision of the Constitution that speaks most directly to the question of access to judicial proceedings, namely, the public-trial provision of the Sixth Amendment.

A

The familiar language of the Sixth Amendment reads: "In all criminal prosecutions, the accused shall enjoy the right

to a speedy and public trial." This provision reflects the tradition of our system of criminal justice that a trial is a "public event" and that "[w]hat transpires in the court room is public property." *Craig* v. *Harney,* 331 U. S. 367, 374 (1947). And it reflects, as well, "the notion, deeply rooted in the common law, that 'justice must satisfy the appearance of justice.' " *Levine* v. *United States,* 362 U. S. 610, 616 (1960), quoting *Offutt* v. *United States,* 348 U. S. 11, 14 (1954).

More importantly, the requirement that a trial of a criminal case be public embodies our belief that secret judicial proceedings would be a menace to liberty. The public trial is rooted in the "principle that justice cannot survive behind walls of silence," *Sheppard* v. *Maxwell,* 384 U. S., at 349, and in the "traditional Anglo-American distrust for secret trials," *In re Oliver,* 333 U. S. 257, 268 (1948). This Nation's accepted practice of providing open trials in both federal and state courts "has always been recognized as a safeguard against any attempt to employ our courts as instruments of persecution. The knowledge that every criminal trial is subject to contemporaneous review in the forum of public opinion is an effective restraint on possible abuse of judicial power." *Id.,* at 270.

The public-trial guarantee, moreover, ensures that not only judges but all participants in the criminal justice system are subjected to public scrutiny as they conduct the public's business of prosecuting crime. This publicity "guards against the miscarriage of justice by subjecting the police, prosecutors, and judicial processes to extensive public scrutiny and criticism." *Sheppard* v. *Maxwell,* 384 U. S., at 350. Publicity "serves to guarantee the fairness of trials and to bring to bear the beneficial effects of public scrutiny upon the administration of justice." *Cox Broadcasting Corp.* v. *Cohn,* 420 U. S. 469, 492 (1975). "The commission of crime, prosecutions resulting from it, and judicial proceedings arising from the prosecutions . . . are without question events of legitimate

concern to the public." *Ibid.* Indeed, such information is "of critical importance to our type of government in which the citizenry is the final judge of the proper conduct of public business." *Id.,* at 495.[2] Even in those few cases in which the Court has permitted limits on courtroom publicity out of concern for prejudicial coverage, it has taken care to emphasize that publicity of judicial proceedings "has always been regarded as the handmaiden of effective judicial administration, especially in the criminal field." *Sheppard* v. *Maxwell,* 384 U. S., at 350. And in *Estes* v. *Texas,* 381 U. S. 532, 541 (1965), the Court found that it "is true that the public has the right to be informed as to what occurs in its courts." MR. JUSTICE STEWART, the author of the Court's opinion here, stated in dissent in *Estes, id.,* at 614–615: "The suggestion that there are limits upon the public's right to know what goes on in the courts causes me deep concern."

---

[2] Although I am dealing here with access under the Sixth Amendment, it is worthy of note that this Court's decisions emphasizing the protection afforded reporting of judicial proceedings under the First Amendment also point up the grave concern that information relating to the administration of criminal justice be widely available. In *Landmark Communications, Inc.* v. *Virginia,* 435 U. S. 829 (1978), for example, the Court noted that "the operation of the judicial system itself . . . is a matter of public interest," *id.,* at 839, and that reporting judicial disciplinary proceedings "lies near the core of the First Amendment." *Id.,* at 838. And in *Nebraska Press Assn.* v. *Stuart,* 427 U. S., at 559, the Court recognized that "[t]ruthful reports of public judicial proceedings have been afforded special protection against subsequent punishment" because of the importance of free commentary about the conduct of the criminal justice system. Any question of access under the Sixth Amendment aside, the "extraordinary protections afforded by the First Amendment" with respect to the reporting of judicial proceedings, *id.,* at 560, indicate the importance attached to making the public aware of the business of the courts. "The administration of the law is not the problem of the judge or prosecuting attorney alone, but necessitates the active cooperation of an enlightened public." *Wood* v. *Georgia,* 370 U. S. 375, 391 (1962). See *Bridges* v. *California,* 314 U. S. 252 (1941); *Pennekamp* v. *Florida,* 328 U. S. 331 (1946).

The importance we as a Nation attach to the public trial is reflected both in its deep roots in the English common law and in its seemingly universal recognition in this country since the earliest times. When *In re Oliver* was decided in 1948, the Court was "unable to find a single instance of a criminal trial conducted in camera in any federal, state, or municipal court during the history of this country," 333 U. S., at 266 (footnote omitted), with the exception of cases in courts-martial and the semiprivate conduct of juvenile court proceedings. *Id.*, at 266 n. 12. Nor could it uncover any record "of even one such secret criminal trial in England since abolition of the Court of Star Chamber in 1641." *Ibid.* This strong tradition of publicity in criminal proceedings, and the States' recognition of the importance of a public trial, led the Court in *In re Oliver* to conclude that the Sixth Amendment's guarantee of a public trial, as applied to the States through the Fourteenth Amendment, proscribed conviction through the type of secret process at issue in that case.

The public-trial concept embodied in the Sixth Amendment remains a fundamental and essential feature of our system of criminal justice in both the federal courts and in the state courts.[3] The Due Process Clause of the Fourteenth Amend-

---

[3] Forty-eight of the fifty States protect the right to a public trial in one way or another. Forty-five have constitutional provisions specifically guaranteeing the right: Ala. Const., Art. 1, § 6; Alaska Const., Art. I, § 11; Ariz. Const., Art. 2, §§ 11, 24; Ark. Const., Art. 2, § 10; Cal. Const., Art. 1, § 15; Colo. Const., Art. 2, § 16; Conn. Const., Art. 1, § 8; Del. Const., Art. 1, §§ 7, 9; Fla. Const., Art. 1, § 16; Ga. Const., Art. 1, § 1, ¶ 11; Haw. Const., Art. 1, § 11; Idaho Const., Art. 1, § 13; Ill. Const., Art. 1, § 8; Ind. Const., Art. 1, §§ 12, 13; Iowa Const., Art. 1, § 10; Kan. Const., Bill of Rights, § 10; Ky. Const., Bill of Rights, §§ 11, 14; La. Const., Art. 1, §§ 16, 22; Me. Const., Art. 1, § 6; Mich. Const., Art. 1, § 20; Minn. Const., Art. 1, § 6; Miss. Const., Art. 3, §§ 24, 26; Mo. Const., Art. 1, § 18 (a); Mont. Const., Art. 2, § 24; Neb. Const., Art. 1, § 11; N. J. Const., Art. 1, ¶ 10; N. M. Const., Art. 2, § 14; N. C. Const., Art. 1, §§ 18, 24; N. D. Const., Art. 1, §§ 13, 22; Ohio Const., Art. 1, §§ 10, 16; Okla. Const., Art. 2, § 20; Ore. Const., Art. 1, § 11; Pa. Const., Art. 1,

ment requires that in criminal cases the States act in conformity with the public-trial provision of the Sixth Amendment. *Duncan* v. *Louisiana,* 391 U. S. 145, 148 (1968); *Argersinger* v. *Hamlin,* 407 U. S. 25, 28 (1972).

## B

By its literal terms, the Sixth Amendment secures the right to a public trial only to "the accused." And in this case, the accused were the ones who sought to waive that right, and to have the public removed from the pretrial hearing in order to guard against publicity that possibly would be prejudicial to them. The Court is urged, accordingly, to hold that the decision of respondents Greathouse and Jones to submit to a private hearing is controlling.

The Court, however, previously has recognized that the Sixth Amendment may implicate interests beyond those of the accused. In *Barker* v. *Wingo,* 407 U. S. 514 (1972), for example, the Court unanimously found this to be so with respect to the right to a speedy trial. "In addition to the general concern that all accused persons be treated according to decent and fair procedures, there is a societal interest in providing a speedy trial which exists separate from, and at

§§ 9, 11; R. I. Const., Art. 1, § 10; S. C. Const., Art. 1, §§ 9, 14; S. D. Const., Art. 6, §§ 7, 20; Tenn. Const., Art. 1, §§ 9, 17; Tex. Const., Art. 1, § 10; Utah Const., Art. 1, §§ 11, 12; Vt. Const., Ch. 1, Art. 10th; Va. Const., Art. 1, § 8; Wash. Const., Art. 1, § 22; W. Va. Const., Art. 3, §§ 14, 17; Wis. Const., Art. 1, § 7; Wyo. Const., Art. 1, § 8.

In addition, New Hampshire has held that the Due Process Clause of its Constitution, Pt. 1, Art. 15, requires that criminal trials be held in public. *Martineau* v. *Helgemoe,* 117 N. H. 841, 842, 379 A. 2d 1040, 1041 (1977). Maryland by judicial decision requires open proceedings. *Dutton* v. *State,* 123 Md. 373, 386–387, 91 A. 417, 422–423 (1914). New York by statute provides for open trials. N. Y. Civil Rights Law, Art. 2, § 12 (McKinney 1976).

Only Masschusetts and Nevada appear to have no state provision for public trials. But see *Commonwealth* v. *Marshall,* 356 Mass. 432, 253 N. E. 2d 333 (1969).

times in opposition to, the interests of the accused." *Id.*, at 519. This separate public interest led the Court to reject a rule that would have made the defendant's assertion of his speedy-trial right the critical factor in deciding whether the right had been denied, for a rule depending entirely on the defendant's demand failed to take into account that "society has a particular interest in bringing swift prosecutions." *Id.*, at 527.

The same is true of other provisions of the Sixth Amendment. In *Singer* v. *United States,* 380 U. S. 24 (1965), the Court rejected a contention that, since the constitutional right to a jury trial was the right of the accused, he had an absolute right to be tried by a judge alone if he considered a bench trial to be to his advantage. Rejecting a mechanistic waiver approach, the Court reviewed the history of trial by jury at English common law and the practice under the Constitution. The common law did not indicate that the accused had a right to compel a bench trial. Although there were isolated instances where such a right had been recognized in the American Colonies, the Court could find no "general recognition of a defendant's right to be tried by the court instead of by a jury. Indeed, if there had been recognition of such a right, it would be difficult to understand why Article III and the Sixth Amendment were not drafted in terms which recognized an option." *Id.*, at 31. Noting that practice under the Constitution similarly established no independent right to a bench trial, the Court held that neither the jury trial provision in Art. III, § 2,[4] nor the Sixth Amendment empowered an accused to compel the opposite of what he was guaranteed specifically by the Constitution.

The Court in *Singer* recognized that in *Patton* v. *United States,* 281 U. S. 276 (1930), it had held that a defendant could waive his jury trial right, but it held that a proffered

---

[4] "The Trial of all Crimes, except in Cases of Impeachment, shall be by Jury."

waiver need not be given effect in all cases. Quoting *Patton,* 281 U. S., at 312, the Court observed: "Trial by jury has been established by the Constitution as the 'normal and . . . preferable mode of disposing of issues of fact in criminal cases.'" 380 U. S., at 35. The Court rejected "the bald proposition that to compel a defendant in a criminal case to undergo a jury trial against his will is contrary to his right to a fair trial or to due process." *Id.,* at 36. Rather, the Court said, a defendant's "only constitutional right concerning the method of trial is to an impartial trial by jury." *Ibid.* Accordingly, the Court concluded that the Constitution was no impediment to conditioning the grant of a request for a bench trial upon the consent of the court and the Government.

In *Singer,* the Court also recognized that similar reasoning is applicable to other provisions to the Sixth Amendment. "The ability to waive a constitutional right does not ordinarily carry with it the right to insist upon the opposite of that right." *Id.,* at 34–35. For example, although the accused "can waive his right to be tried in the State and district where the crime was committed, he cannot in all cases compel transfer of the case to another district." *Id.,* at 35. While he "can waive his right to be confronted by the witnesses against him," he cannot thereby compel the prosecution "to try the case by stipulation." And, most relevant here, "although a defendant can, under some circumstances, waive his constitutional right to a public trial, he has no absolute right to compel a private trial." *Ibid.*

Indeed, in only one case, apparently, *Faretta* v. *California,* 422 U. S. 806 (1975), has this Court ever inferred from the Sixth Amendment a right that fairly may be termed the "opposite" of an explicit guarantee. In *Faretta,* the Court found that not only did the Amendment secure the assistance of counsel to the defendant in a criminal prosecution, but, by inference, it also granted him the right to self-representation.

In so ruling, however, the Court was careful to stress that it followed *Singer*'s holding that the ability to waive a Sixth Amendment right did not carry with it the automatic right to insist upon its opposite. "The inference of rights is not, of course, a mechanical exercise." 422 U. S., at 819 n. 15. By inferring the existence of a right to self-representation, the Court did not mean to "suggest that this right arises mechanically from a defendant's power to waive the right to the assistance of counsel. . . . On the contrary, the right must be independently found in the structure and history of the constitutional text." *Id.*, at 819–820, n. 15. Following the approach of *Singer*, then, the Court found that "the structure of the Sixth Amendment, as well as . . . the English and colonial jurisprudence from which the Amendment emerged," 422 U. S., at 818, established the existence of an independent right of self-representation.

## C

It is thus clear from *Singer, Barker,* and *Faretta* that the fact the Sixth Amendment casts the right to a public trial in terms of the right of the accused is not sufficient to permit the inference that the accused may compel a private proceeding simply by waiving that right. Any such right to compel a private proceeding must have some independent basis in the Sixth Amendment. In order to determine whether an independent basis exists, we should examine, as the Court did in *Singer,* the common-law and colonial antecedents of the public-trial provision as well as the original understanding of the Sixth Amendment. If no such basis is found, we should then turn to the function of the public trial in our system so that we may decide under what circumstances, if any, a trial court may give effect to a defendant's attempt to waive his right.

1. The Court, in *In re Oliver,* 333 U. S., at 266, recognized that this Nation's "accepted practice of guaranteeing a public trial to an accused has its roots in our English common law heritage." Study of that heritage reveals that the tradition

of conducting the proceedings in public came about as an inescapable concomitant of trial by jury, quite unrelated to the rights of the accused, and that the practice at common law was to conduct all criminal proceedings in public.

Early Anglo-Saxon criminal proceedings were "open-air meetings of the freemen who were bound to attend them." F. Pollock, The Expansion of the Common Law 140 (1904) (hereinafter Pollock). Criminal trials were by compurgation or by ordeal, and took place invariably before the assembled community, many of whom were required to attend. 1 W. Holdsworth, A History of English Law 7–24 (4th ed. 1927) (hereinafter Holdsworth). This Anglo-Saxon tradition of conducting a judicial proceeding "like an ill-managed public meeting," Pollock 30, persisted after the Conquest, when the Norman kings introduced in England the Frankish system of conducting inquests by means of a jury. Wherever royal justice was introduced, the jury system accompanied it, and both spread rapidly throughout England in the years after 1066. 1 Holdsworth 316. The rapid spread of royal courts led to the replacement of older methods of trial, which were always public, with trial by jury with little procedural change. The jury trial "was simply substituted for [older methods], and was adapted with as little change as possible to its new position." *Id.,* at 317. This substitution of royal justice for traditional law served the Crown's interests by "enlarging the king's jurisdiction and bringing well-earned profit in fines and otherwise to the king's exchequer, and the best way of promoting those ends was to develop the institution, or let it develop itself, along the lines of least resistance." Pollock 40.

Thus, the common law from its inception was wedded to the Anglo-Saxon tradition of publicity, and the "ancient rul'[e that c]ourts of justice are public," *id.,* at 51, was in turn strengthened by the hegemony the royal courts soon established over the administration of justice. Bentham noted that by this accommodation of the common law to the Anglo-

Saxon practice of holding open courts, "publicity . . . became a natural, and, as good fortune would have it, at length an inseparable, concomitant" of English justice. 1 J. Bentham, The Rationale of Judicial Evidence 584–585 (1827).

Publicity thus became intrinsically associated with the sittings of the royal courts. Coke noted that the very words "In curia Domini Regis" ("In the King's Court"), in the Statutum de Marleberge, ch. 1, enacted in 1267, 52 Hen. 3, indicated public proceedings. 2 E. Coke, Institutes of the Laws of England 103 (6th ed. 1681).[5]

This and other commentary [6] indicate that by the 17th century the concept of a public trial was firmly established under the common law. Indeed, there is little record, if any, of secret proceedings, criminal or civil, having occurred at any time in known English history. Apparently, not even the Court of Star Chamber, the name of which has been linked with secrecy, conducted hearings in private. 5 Holdsworth 156, and nn. 5 and 7, and 163; Radin, The Right to a Public Trial, 6 Temp. L. Q. 381, 386–387 (1932). Rather, the unbroken tradition of the English common law was that criminal trials were conducted "openlie in the presence of the Judges,

---

[5] "These words are of great importance, for all Causes ought to be heard, ordered, and determined before the Judges of the Kings Courts openly in the Kings Courts, whither all persons may resort; and in no chambers, or other private places: for the Judges are not Judges of chambers, but of Courts, and therefore in open Court, where the parties Councel and Attorneys attend, ought orders, rules, awards, and Judgments to be made and given, and not in chambers or other private places . . . . Nay, that Judge that ordereth or ruleth a Cause in his chamber, though his order or rule be just, yet offendeth he the Law, (as here it appeareth) because he doth it not in Court."

[6] See, e. g., T. Smith, De Republica Anglorum 79, 101 (Alston ed. 1972), published in 1583, where the author, in contrasting the English common law with the civil law system of the Continent, stressed that in England all adjudications were open to the public as a matter of course. See also *Trial of John Lilburne* (1649), reported in 4 How. St. Tr. 1270, 1274 (1816).

the Justices, the enquest, the prisoner, and so manie as will or can come so neare as to heare it, and all depositions and witnesses given aloude, that all men may heare from the mouth of the depositors and witnesses what is saide." T. Smith, De Republica Anglorum 101 (Alston ed. 1972).

In the light of this history, it is most doubtful that the tradition of publicity ever was associated with the rights of the accused. The practice of conducting the trial in public was established as a feature of English justice long before the defendant was afforded even the most rudimentary rights. For example, during the century preceding the English Civil War, the defendant was kept in secret confinement and could not prepare a defense. He was not provided with counsel either before or at the trial. He was given no prior notice of the charge or evidence against him. He probably could not call witnesses on his behalf. Even if he could, he had no means to procure their attendance. Witnesses were not necessarily confronted with the prisoner. Document originals were not required to be produced. There were no rules of evidence. The confessions of accomplices were admitted against each other and regarded as specially cogent evidence. And the defendant was compelled to submit to examination. 1 J. Stephen, A History of the Criminal Law of England 350 (1883). Yet the trial itself, without exception, was public.

It is not surprising, therefore, that both Hale and Blackstone, in identifying the function of publicity at common law, discussed the open-trial requirement not in terms of individual liberties but in terms of the effectiveness of the trial process. Each recognized publicity as an essential of trial at common law. And each emphasized that the requirement that evidence be given in open court deterred perjury, since "a witness may frequently depose that in private, which he will be ashamed to testify in a public and solemn tribunal." 3 W. Blackstone, Commentaries *373. See M. Hale, The History of the Common Law of England 343, 345 (6th ed. 1820).

Similarly, both recognized that publicity was an effective check on judicial abuse, since publicity made it certain that "if the judge be PARTIAL, his partiality and injustice will be evident to all by-standers." *Id.,* at 344. See 3 W. Blackstone, Commentaries *372.[7]

In the same vein, Bentham stressed that publicity was "the most effectual safeguard of testimony, and of the decisions depending on it; it is the soul of justice;.it ought to be extended to every part of the procedure, and to all causes." J. Bentham, A Treatise On Judicial Evidence 67 (1825). Bentham believed that, above all, publicity was the most effectual safeguard against judicial abuse, without which all other checks on misuse of judicial power became ineffectual. 1 J. Bentham, The Rationale of Judicial Evidence 525 (1827). And he contended that publicity was of such importance to the administration of justice, especially in criminal cases, that it should not be dispensed with even at the request of the defendant. "The reason is . . . there is a party interested (viz. the public at large) whose interest might, by means of the privacy in question, and a sort of conspiracy, more or less explicit, between the other persons concerned (the judge included) be made a sacrifice." *Id.,* at 576–577.

This English common-law tradition concerning public trials out of which the Sixth Amendment provision grew is not made up of "shreds of English legal history and early state constitutional and statutory provisions," see *Faretta* v. *California,* 422 U. S., at 843 (dissenting opinion describing the right of self-representation), pieced together to produce the desired result.

---

[7] Similarly, the Solicitor General, Sir John Hawles, in 1685 in his Remarks upon Mr. Cornish's Trial, 11 How. St. Tr. 455, 460, stated:

"The reason that all matters of law are, or ought to be transacted publicly, is, That any person, unconcerned as well as concerned, may, as *amicus curiae,* inform the court better, if he thinks they are in an error, that justice may be done: and the reason that all trials are public, is, that any person may inform in point of fact, though not *subpoena'd,* that truth may be discovered in civil as well as criminal matters."

Whatever may be said of the historical analysis of other Sixth Amendment provisions, history here reveals an unbroken tradition at English common law of open judicial proceedings in criminal cases. In publicity, we "have one tradition, at any rate, which has persisted through all changes" from Anglo-Saxon times through the development of the modern common law. Pollock 31–32. See E. Jenks, The Book of English Law 73–74 (6th ed. 1967). There is no evidence that criminal trials of any sort ever were conducted in private at common law, whether at the request of the defendant or over his objection. And there is strong evidence that the public trial, which developed before other procedural rights now routinely afforded the accused, widely was perceived as serving important social interests, relating to the integrity of the trial process, that exist apart from, and conceivably in opposition to, the interests of the individual defendant. Accordingly, I find no support in the common-law antecedents of the Sixth Amendment public-trial provision for the view that the guarantee of a public trial carries with it a correlative right to compel a private proceeding.[8]

---

[8] The continuing development in England of the common-law notion of publicity during the years since the founding of our own Nation casts light upon the function of publicity in our system of justice. For example, in a series of cases establishing a privilege for the reporting of judicial proceedings, the courts recognized: "Though the publication of such proceedings may be to the disadvantage of the particular individual concerned, yet it is of vast importance to the public that the proceedings of Courts of Justice should be universally known. The general advantage to the country in having these proceedings made public, more than counterbalances the inconveniences to the private persons whose conduct may be the subject of such proceedings." *King* v. *Wright,* 8 D. & E. 293, 298, 101 Eng. Rep. 1396, 1399 (K. B. 1799). See *Davison* v. *Duncan,* 7 El. & Bl. 229, 230–231, 119 Eng. Rep. 1233, 1234 (Q. B. 1857); *Wason* v. *Walter,* 4 L. R. 73, 88 (Q. B. 1868).

Important for my purposes is the decision in *Daubney* v. *Cooper,* 10 B. & C. 237, 109 Eng. Rep. 438 (K. B. 1829). There the court upheld a verdict for damages in an action by a spectator, who had been ejected

2. This English common-law view of the public trial early was transplanted to the American Colonies, largely through the influence of the common-law writers whose views shaped the early American legal systems. "Coke's Institutes were read in the American Colonies by virtually every student of the law," *Klopfer* v. *North Carolina,* 386 U. S. 213, 225 (1967), and no citation is needed to establish the impact of Hale and Blackstone on colonial legal thought. Early colonial charters reflected the view that open proceedings were an essential quality of a court of justice, and they cast the concept of a public trial in terms of a characteristic of the system of justice, rather than of a right of the accused. Indeed, the first public-trial provision to appear in America spoke in terms of the right of the public, not the accused, to attend trials:

> "That in all publick courts of justice for tryals of causes, civil or criminal, any person or persons, inhabitants of the said Province may freely come into, and attend the said courts, and hear and be present, at all or any such tryals as shall be there had or passed, that justice may not be done in a corner nor in any covert manner." Concessions and Agreements of West New Jersey (1677), ch. XXIII, quoted in 1 B. Schwartz, The Bill of Rights: A Documentary History 129 (1971) (hereinafter Schwartz).

---

from a criminal proceeding, against the magistrate who had ejected him. The court stated:

"[I]t is one of the essential qualities of a court of justice that its proceedings should be public, and that all parties who may be desirous of hearing what is going on, if there be room in the place for that purpose,— provided they do not interrupt the proceedings, and provided there is no specific reason why they should be removed,—have a right to be present for the purpose of hearing what is going on." *Id.,* at 240, 109 Eng. Rep., at 440.

See also *Scott* v. *Scott,* [1913] A. C. 417, 438–439 (Haldane, L. C.), 440–441 (Earl of Halsbury).

Similarly, the Pennsylvania Frame of Government of 1682, which Professor Schwartz described as, "[i]n many ways, [one of] the most influential of the Colonial documents protecting individual rights," 1 Schwartz 130, provided that in William. Penn's colony "all courts shall be open." *Id.*, at 140.

This practice of conducting judicial proceedings in criminal cases in public took firm hold in all the American Colonies. There is no evidence that any colonial court conducted criminal trials behind closed doors or that any recognized the right of an accused to compel a private trial.

Neither is there any evidence that casting the public-trial concept in terms of a right of the accused signaled a departure from the common-law practice by granting the accused the power to compel a private proceeding. The first provision to speak of the public trial as an entitlement of the accused apparently was that in ¶ IX of the Pennsylvania Declaration of Rights of 1776. It said that "in all prosecutions for criminal offences, a man hath a right to . . . a speedy public trial." See 1 Schwartz 265. The provision was borrowed almost verbatim from the Virginia Declaration of Rights, adopted earlier the same year, with one change: the word "public" was added. Virginia's Declaration had provided only that the accused "hath a right to . . . a speedy trial." See *id.*, at 235. It is doubtful that, by adding this single word, Pennsylvania intended to depart from its historic practice by creating a right waivable by the defendant, for at the time its Declaration of Rights was adopted, Pennsylvania also adopted its Constitution of 1776, providing, in § 26, that "[a]ll courts shall be open." See 1 Schwartz 271. And there is no evidence that after 1776 Pennsylvania departed from earlier practice, either by conducting trials in private or by recognizing a power in the accused to compel a nonpublic proceeding.[9]

_____

[9] Although a number of States followed the language of Virginia's Declaration, only Vermont copied the Pennsylvania emendation by adding the word "public" to the speedy-trial provision. Vt. Const., Declaration

Similarly, there is no indication that the First Congress, in proposing what became the Sixth Amendment, meant to depart from the common-law practice by creating a power in an accused to compel a private proceeding. The Constitution as originally adopted, of course, did not contain a public-trial guarantee. And though several States proposed amendments to Congress along the lines of the Virginia Declaration, only New York mentioned a "public" trial. See E. Dumbauld, The Bill of Rights 173–205 and, specifically, 190 (1957); 1 Elliot's Debates 328 (2d ed. 1836). But New York did not follow Virginia's language by casting the right as one belonging only to the accused; it urged rather that Congress should propose an amendment providing that the "trial should be speedy, public, and by an impartial jury . . . ." Amendments Proposed by New York (1788), quoted in 1 Elliot's Debates, at 328.

I am thus persuaded that Congress, modeling the proposed amendment on the cognate provision in the Virginia Declaration, as many States had urged, did merely what Pennsylvania had done in 1776, namely, added the word "public" to the Virginia language without at all intending thereby to create a correlative right to compel a private proceeding. Indeed, in light of the settled practice at common law, one may also say here that "if there had been recognition of such a right, it would be difficult to understand why . . . the Sixth Amendment [was] not drafted in terms which recognized an option." *Singer* v. *United States,* 380 U. S., at 31. And, to use the language of the Court in *Faretta* v. *California,* 422

---

of Rights § X (1777), quoted in 1 Schwartz 323. Once again, however, there is no evidence that by so doing Vermont intended to depart from the common-law practice of holding court in public. Indeed, the Vermont Declaration, adopted by the revolutionary legislature in haste, was "virtually [a] verbatim repetitio[n] of the relevant Pennsylvania" article. 1 Schwartz 319. It is thus doubtful that by adding the word "public" Vermont, any more than Pennsylvania, intended to alter existing practice.

U. S., at 832: "If anyone had thought that the Sixth Amendment, as drafted," departed from the common-law principle of publicity in criminal proceedings, "there would undoubtedly have been some debate or comment on the issue. But there was none." Mr. Justice Story, writing when the adoption of the Sixth Amendment was within the memory of living man, noted that "in declaring, that the accused shall enjoy the right to a speedy and public trial . . . [the Sixth Amendment] does but follow out the established course of the common law in all trials for crimes. The trial is always public." 3 J. Story, Commentaries on the Constitution of the United States 662 (1833).

I consequently find no evidence in the development of the public-trial concept in the American Colonies and in the adoption of the Sixth Amendment to indicate that there was any recognition in this country, any more than in England, of a right to a private proceeding or a power to compel a private trial arising out of the ability to waive the grant of a public one. I shall not indulge in a mere mechanical inference that, by phrasing the public trial as one belonging to the accused, the Framers of the Amendment must have meant the accused to have the power to dispense with publicity.

3. I thus conclude that there is no basis in the Sixth Amendment for the suggested inference. I also find that, because there is a societal interest in the public trial that exists separately from, and at times in opposition to, the interests of the accused, cf. *Barker* v. *Wingo,* 407 U. S., at 519, a court may give effect to an accused's attempt to waive his public-trial right only in certain circumstances.

The courts and the scholars of the common law perceived the public-trial tradition as one serving to protect the integrity of the trial and to guard against partiality on the part of the court. The same concerns are generally served by the public trial today. The protection against perjury which publicity provides, and the opportunity publicity offers to unknown witnesses to make themselves known, do not necessarily serve

the defendant. See 6 J. Wigmore, Evidence § 1834 (Chadbourn rev. 1976) (hereinafter Wigmore). The public has an interest in having criminal prosecutions decided on truthful and complete records, and this interest, too, does not necessarily coincide with that of the accused.

Nor does the protection against judicial partiality serve only the defendant. It is true that the public-trial provision serves to protect every accused from the abuses to which secret tribunals would be prone. But the defendant himself may benefit from the partiality of a corrupt, biased, or incompetent judge, "for a secret trial can result in favor to as well as unjust prosecution of a defendant." *Lewis* v. *Peyton,* 352 F. 2d 791, 792 (CA4 1965).

Open trials also enable the public to scrutinize the performance of police and prosecutors in the conduct of public judicial business. Trials and particularly suppression hearings typically involve questions concerning the propriety of police and government conduct that took place hidden from the public view. Any interest on the part of the prosecution in hiding police or prosecutorial misconduct or ineptitude may coincide with the defendant's desire to keep the proceedings private, with the result that the public interest is sacrificed from both sides.

Public judicial proceedings have an important educative role as well. The victim of the crime, the family of the victim, others who have suffered similarly, or others accused of like crimes, have an interest in observing the course of a prosecution. Beyond this, however, is the interest of the general public in observing the operation of the criminal justice system. Judges, prosecutors, and police officials often are elected or are subject to some control by elected officials, and a main source of information about how these officials perform is the open trial. And the manner in which criminal justice is administered in this country is in and of itself of interest to all citizens. In *Cox Broadcasting Corp.* v. *Cohn,*

420 U. S., at 495, it was noted that information about the criminal justice system "appears to us to be of critical importance to our type of government in which the citizenry is the final judge of the proper conduct of public business."

Important in this regard, of course, is the appearance of justice. "Secret hearings—though they be scrupulously fair in reality—are suspect by nature. Public confidence cannot long be maintained where important judicial decisions are made behind closed doors and then announced in conclusive terms to the public, with the record supporting the court's decision sealed from public view." *United States* v. *Cianfrani,* 573 F. 2d 835, 851 (CA3 1978). The ability of the courts to administer the criminal laws depends in no small part on the confidence of the public in judicial remedies, and on respect for and acquaintance with the processes and deliberations of those courts. 6 Wigmore § 1834, at 438. Anything that impairs the open nature of judicial proceedings threatens to undermine this confidence and to impede the ability of the courts to function.

These societal values secured by the public trial are fundamental to the system of justice on both the state and federal levels. As such, they have been recognized by the large majority of both state [10] and federal [11] courts that have con-

---

[10] Nearly every State that has considered the issue has recognized that the public has a strong interest in maintaining open trials. Most of these cases have involved state constitutional provisions modeled on the Sixth Amendment in that the public-trial right is phrased in terms of a guarantee to the accused. See, *e. g., Jackson* v. *Mobley,* 157 Ala. 408, 411–412, 47 So. 590, 592 (1908); *Commercial Printing Co.* v. *Lee,* 262 Ark. 87, 93–96, 553 S. W. 2d 270, 273–274 (1977); *Lincoln* v. *Denver Post,* 31 Colo. App. 283, 285–286, 501 P. 2d 152, 154 (1972); *State ex rel. Gore Newspapers Co.* v. *Tyson,* 313 So. 2d 777, 785–788 (Fla. App. 1975); *Gannett Pacific Corp.* v. *Richardson,* 59 Haw. 224, 230–231, 580 P. 2d 49, 55 (1978); *State* v. *Beaudoin,* 386 A. 2d 731, 733 (Me. 1978); *Cox* v. *State,* 3 Md. App. 136, 139–140, 238 A. 2d 157, 158–159 (1968); *State* v. *Schmit,* 273 Minn. 78, 86–88, 139 N. W. 2d 800, 806–807 (1966); *State* v. *Keeler,* 52

[*Footnote 11 is on p. 430*]

sidered the issue over the years since the adoption of the Constitution. Indeed, in those States with constitutional pro-

Mont. 205, 218–219, 156 P. 1080, 1083–1084 (1916); *Keene Publishing Corp.* v. *Keene District Court,* 117 N. H. 959, 962–963, 380 A. 2d 261, 263–264 (1977); *State* v. *Allen,* 73 N. J. 132, 157–160, 373 A. 2d 377, 389–390 (1977); *Neal* v. *State,* 86 Okla. Cr. 283, 289, 192 P. 2d 294, 297 (1948); *State* v. *Holm,* 67 Wyo. 360, 382–385, 224 P. 2d 500, 508–509 (1950).

Several States have recognized such an interest under constitutional provisions establishing open courts. *E. g., State* v. *White,* 97 Ariz. 196, 198, 398 P. 2d 903, 904 (1965); *Smith* v. *State,* 317 A. 2d 20, 23–24 (Del. 1974); *Johnson* v. *Simpson,* 433 S. W. 2d 644, 646 (Ky. 1968); *Brown* v. *State,* 222 Miss. 863, 869, 77 So. 2d 694, 696 (1955); *In re Edens,* 290 N. C. 299, 306, 226 S. E. 2d 5, 9–10 (1976); *E. W. Scripps Co.* v. *Fulton,* 100 Ohio App. 157, 160–169, 125 N. E. 2d 896, 899–904 (1955); *State ex rel. Varney* v. *Ellis,* 149 W. Va. 522, 523–524, 142 S. E. 2d 63, 65 (1965).

Massachusetts appears to have no case precisely in point. But in *Cowley* v. *Pulsifer,* 137 Mass. 392 (1884), the Supreme Judicial Court, in an opinion by Mr. Justice Holmes, stated that the chief advantage of permitting a privilege for publication of reports of judicial proceedings "is the security which publicity gives for the proper administration of justice." *Id.,* at 394. The court continued:

"[This] privilege and the access of the public to the courts stand in reason upon common ground. . . . It is desirable that the trial of causes should take place under the public eye, not because the controversies of one citizen with another are of public concern, but because it is of the highest moment that those who administer justice should always act under the sense of public responsibility, and that every citizen should be able to satisfy himself with his own eyes as to the mode in which a public duty is performed." *Ibid.*

[11] See, *e. g., United States* v. *Clark,* 475 F. 2d 240, 246–247 (CA2 1973); *Stamicarbon, N. V.* v. *American Cyanamid Co.,* 506 F. 2d 532, 540–542 (CA2 1974); *United States* v. *Cianfrani,* 573 F. 2d 835, 852–854 (CA3 1978); *Lewis* v. *Peyton,* 352 F. 2d 791, 792 (CA4 1965).

The Court today cites no case where the public has been totally excluded from all of a trial or all of a pretrial suppression hearing. See *ante,* at 388 n. 19. Indeed, in almost every case that the Court cites, no such general exclusion was permitted: In *Geise* v. *United States,* 262 F. 2d 151, 155 (CA9 1958), for example, the press, members of the bar, and relatives and friends of parties and the witnesses were allowed to remain. Similarly, in *United*

visions modeled on the Sixth Amendment, guaranteeing the right to a public trial literally only to the accused, there has

*States ex rel. Orlando* v. *Fay,* 350 F. 2d 967, 970 (CA2 1965), the press and members of the bar were admitted at all times. In *State* v. *Croak,* 167 La. 92, 94–95, 118 So. 703, 704 (1928), a fair-sized audience composed of members of the public was always present. The court in *Beauchamp* v. *Cahill,* 297 Ky. 505, 508, 180 S. W. 2d 423, 424 (1944), though it recognized that the trial court could exclude limited classes of spectators in certain circumstances, held that that court could not exclude a "reasonable portion of the public" who wanted to attend, and it disapproved the limited exclusion that did occur. In *State* v. *Callahan,* 100 Minn. 63, 110 N. W. 342 (1907), and *Hogan* v. *State,* 191 Ark. 437, 86 S. W. 2d 931 (1935), the Court does point to cases where a court upheld an exclusion of all the public, though even there the exclusions were for strictly limited periods of time. Those exclusions were over the objections of the defendants, and they surely are questionable law today, not only under the Sixth Amendment but under state law as well. See *State* v. *Schmit,* 273 Minn., at 86–88, 139 N. W. 2d, at 805–807; *Commercial Printing Co.* v. *Lee,* 262 Ark., at 93–96, 553 S. W. 2d, at 273–274.

Similarly, though the Court cites a number of state statutory provisions that it says contain limitations on public trials, it cites no cases decided under those provisions excluding all the public and the press from trials or suppression hearings. If any such cases exist, which is doubtful, they are few indeed. It appears, rather, that such statutes have been interpreted to permit limited exclusion of certain groups of spectators from trial, but seldom applied so as to result in blanket exclusion of the public and press. For example, in *Reeves* v. *State,* 264 Ala. 476, 483, 88 So. 2d 561, 567 (1956), the court, in applying the Alabama provision cited by the Court, *ante,* at 388 n. 19, noted that the trial court had not excluded, among others, "members of the press, radio, television or other newsgathering services, . . . [and] members of the bar." Accord, *Ex parte Rudolph,* 276 Ala. 392, 393, 162 So. 2d 486, 487 (1964). Similarly, in applying the Georgia statute cited by the Court, the courts of that State have not excluded, among others, members of the press and of the bar. *E. g., Moore* v. *State,* 151 Ga. 648, 651–652, 658–659, 108 S. E. 47, 49, 52 (1921). Indeed, in *Moore,* the trial court allowed the press to attend as one of the "parties at interest" not excludable. *Id.,* at 651, 108 S. E., at 49. And in upholding the constitutionality of the Massachusetts statute permitting exclusion in certain cases involving sex crimes, the Supreme Judicial Court noted that the press had not been excluded under the statute, and that it therefore need not reach the constitutionality of the

been widespread recognition that such provisions serve the interests of the public as well as those of the defendant.[12]

I therefore conclude that the Due Process Clause of the Fourteenth Amendment, insofar as it incorporates the public-

---

statute in circumstances where the press was excluded, "even if the statute could be interpreted as permitting such exclusion" of the press. *Commonwealth* v. *Blondin*, 324 Mass. 564, 572, 87 N. E. 2d 455, 460 (1949). There is no evidence that under any of the other provisions cited by the Court tribunals have excluded all members of the public, including the press, from a trial or suppression proceeding.

The Court in *In re Oliver* recognized that, even though some cases up to that time had allowed limited departures from publicity, no court had gone so far as to sanction exclusion of the press. 333 U. S., at 272 n. 29. Since that time only the New York courts in this case, and perhaps some isolated others, have departed from this tradition in criminal cases. And although some commentators have criticized the Sixth Amendment approach to establishing a public right of access, they have gone on to find that right rooted in some other provision of the Constitution. *E. g.,* Note, The Right to Attend Criminal Hearings, 78 Colum. L. Rev. 1308, 1326–1331 (1978) (public access right derived from combination of the First and Sixth Amendments). Even Radin, whose ideas in this area Professor Wigmore described as "farfetched," 6 Wigmore § 1834, though he criticized public access, would not have excluded the press and selected members of the public from any trial. Radin, The Right to a Public Trial, 6 Temple L. Q. 381, 394–395 (1932).

[12] See cases cited in n. 10, *supra.* For example, in *Commercial Printing Co.* v. *Lee*, 262 Ark. 87, 553 S. W. 2d 270 (1977), the Supreme Court of Arkansas held that the exclusion of the public from the *voir dire* phase of a criminal trial violated the State's public-trial constitutional provision, even though it, like the Sixth Amendment, literally read in favor of only the accused. The court found that members of the public have a strong interest in observing criminal proceedings, inasmuch as they involve crimes against society. And it added that since courthouses, prosecutors, judges, and often defense attorneys are paid for with public funds, the public "has every right to ascertain by personal observation whether its officials are properly carrying out their duties in responsibly and capably administering justice, and it would require unusual circumstances for this right to be held subordinate to the contention of a defendant that he is prejudiced by a public trial (or any part thereof)." *Id.,* at 95, 553 S. W. 2d, at 274.

trial provision of the Sixth Amendment, prohibits the States from excluding the public from a proceeding within the ambit of the Sixth Amendment's guarantee without affording full and fair consideration to the public's interests in maintaining an open proceeding. And I believe that the Sixth and Fourteenth Amendments require this conclusion notwithstanding the fact it is the accused who seeks to close the trial.[13]

## D

Before considering whether and under what circumstances a court may conduct a criminal proceeding in private, one must first decide whether the Sixth Amendment, as applied through the Fourteenth, encompasses the type of pretrial hearing contemplated by *Jackson* v. *Denno,* 378 U. S. 368 (1964), and at issue in this case. The Amendment, of course, speaks only of a public "trial." Both the County Court and the New York Court of Appeals emphasized that exclusion from the formal trial on the merits was not at issue, apparently in the belief that the Sixth Amendment's public-trial provision applies with less force, or not at all, to a pretrial proceeding.

---

[13] The American Bar Association Standards adopt the view that the public has a strong interest in maintaining the openness of criminal trials, and that the Sixth Amendment protects that interest:

"The sixth amendment speaks in terms of the right of the accused to a public trial, but this right does not belong solely to the accused to assert or forgo as he or she desires. . . . The defendant's interest, primarily, is to ensure fair treatment in his or her particular case. While the public's more generalized interest in open trials includes a concern for justice to individual defendants, it goes beyond that. The transcendent reason for public trials is to ensure efficiency, competence, and integrity in the overall operation of the judicial system. Thus, the defendant's willingness to waive the right to a public trial in a criminal case cannot be the deciding factor. . . . It is just as important to the public to guard against undue favoritism or leniency as to guard against undue harshness or discrimination." ABA Project on Standards for Criminal Justice, Fair Trial and Free Press, Standard 8–3.2, p. 15 (App. Draft 1978). (Footnotes omitted.)

I find good reason to hold that even if a State, as it may, chooses to hold a *Jackson* v. *Denno* or other suppression hearing separate from and prior to the full trial, the Sixth Amendment's public-trial provision applies to that hearing. First, the suppression hearing resembles and relates to the full trial in almost every particular. Evidence is presented by means of live testimony, witnesses are sworn, and those witnesses are subject to cross-examination. Determination of the ultimate issue depends in most cases upon the trier of fact's evaluation of the evidence, and credibility is often crucial. Each side has incentive to prevail, with the result that the role of publicity as a testimonial safeguard, as a mechanism to encourage the parties, the witnesses, and the court to a strict conscientiousness in the performance of their duties, and in providing a means whereby unknown witnesses may become known, is just as important for the suppression hearing as it is for the full trial.

Moreover, the pretrial suppression hearing often is critical, and it may be decisive, in the prosecution of a criminal case. If the defendant prevails, he will have dealt the prosecution's case a serious, perhaps fatal, blow; the proceeding often then will be dismissed or negotiated on terms favorable to the defense. If the prosecution successfully resists the motion to suppress, the defendant may have little hope of success at trial (especially where a confession is in issue), with the result that the likelihood of a guilty plea is substantially increased. *United States* v. *Clark,* 475 F. 2d 240, 246–247 (CA2 1973); *United States* v. *Cianfrani,* 573 F. 2d, at 848–851.

The suppression hearing often is the only judicial proceeding of substantial importance that takes place during a criminal prosecution. In this very case, the hearing from which the public was excluded was the only one in which the important factual and legal issues in the prosecution of respondents Greathouse and Jones were considered. It was the only proceeding at which the conduct of the police, prosecution, and

the court itself was exposed to scrutiny. Indeed, in 1976, when this case was processed, every felony prosecution in Seneca County—and I say this without criticism—was terminated without a trial on the merits. N. Y. Leg. Doc. No. 90, Judicial Conference of the State of New York, 22d Annual Report 55 (1977). This statistic is characteristic of our state and federal criminal justice systems as a whole,[14] and it underscores the importance of the suppression hearing in the functioning of those systems.

Further, the issues considered at such hearings are of great moment beyond their importance to the outcome of a particular prosecution. A motion to suppress typically involves, as in this case, allegations of misconduct by police and prosecution that raise constitutional issues. Allegations of this kind, although they may prove to be unfounded, are of importance to the public as well as to the defendant. The searches and interrogations that such hearings evaluate do not take place in public. The hearing therefore usually presents the only opportunity the public has to learn about police and prosecutorial conduct, and about allegations that those responsible to the public for the enforcement of laws themselves are breaking it.

A decision to suppress often involves the exclusion of highly relevant evidence. Because this is so, the decision may generate controversy. See *Bivens* v. *Six Unknown Fed. Narcotics*

---

[14] In 1976, in the Supreme Court for the city of New York, 89.7% of all criminal cases were terminated by dismissal (25.6%) or by plea of guilty (64.1%). N. Y. Leg. Doc. No. 90, Judicial Conference of the State of New York, 22d Annual Report 52 (1977). In the Supreme Courts and County Courts outside New York City, 93.4% of the criminal cases were disposed of by dismissal (18.9%) or by plea of guilty (74.5%). *Id.*, at 56.

As noted, these statistics are characteristic of the criminal justice system across the country. See generally National Institute of Law Enforcement and Criminal Justice, Law Enforcement Assistance Administration, Plea Bargaining in the United States, App. A (1978).

*Agents,* 403 U. S. 388, 412–420 (1971) (dissenting opinion). It is important that any such decision be made on the basis of evidence and argument offered in open court, so that all who care to see or read about the case may evaluate for themselves the propriety of the exclusion.

These factors lead me to conclude that a pretrial suppression hearing is the close equivalent of the trial on the merits for purposes of applying the public-trial provision of the Sixth Amendment. Unlike almost any other proceeding apart from the trial itself, the suppression hearing implicates all the policies that require that the trial be public. For this reason, I would be loath to hold that a State could conduct a pretrial *Jackson* v. *Denno* hearing in private over the *objection* of the defendant. And for this same reason, the public's interest in the openness of judicial proceedings is implicated fully when it is the accused who seeks to exclude the public from such a hearing. Accordingly, I conclude that the Sixth and Fourteenth Amendments prohibit a State from conducting a pretrial suppression hearing in private, even at the request of the accused, unless full and fair consideration is first given to the public's interest, protected by the Amendments, in open trials.[15]

The Court holds, however, that, even assuming the Sixth and Fourteenth Amendments could be viewed as embodying a public right of access to trials, there was no common-law right in members of the public to attend preliminary proceedings.

But I have not said that there was. I have demonstrated that there was a right to attend trials. And I have said that, because of the critical importance of suppression hearings to our systems of criminal justice—as well as because of the close similarity in form of a suppression hearing to a full

---

[15] The ABA Standards take the position that pretrial suppression hearings are within the scope of the Sixth Amendment's public-trial provision. ABA Project on Standards for Criminal Justice, Fair Trial and Free Press, Standard 8–3.2, p. 15, and n. 1 (App. Draft 1978).

trial—for purposes of the Sixth Amendment public-trial pro-
vision the pretrial suppression hearing at issue in this case
must be considered part of the trial.

It is significant that the sources upon which the Court
relies do not concern suppression hearings. They concern
hearings to determine probable cause to bind a defendant
over for trial. *E. g.,* Indictable Offences Act, 11 & 12 Vict.,
ch. 42, §§ 17, 19 (1848); Cal. Penal Code Ann. § 868 (West
Supp. 1979). Such proceedings are not critical to the criminal
justice system in the way the suppression-of-evidence hearing
is and they are not close equivalents of the trial itself in form.
The fact that such proceedings might have been held in pri-
vate at common law in England or in this country does not
detract from my conclusion that pretrial suppression hearings
should not be, any more than does the fact that grand juries—
or preliminary proceedings such as coroner's inquests at com-
mon law—were and are secret.

Indeed, the modern suppression hearing, unknown at com-
mon law, is a type of objection to evidence such as took place
at common law, and as takes place today in the case of non-
constitutional objections, in *open court* during trial. There
is no federal requirement that States conduct suppression hear-
ings prior to trial. See *Pinto* v. *Pierce,* 389 U. S. 31, 32
(1967). I assume that if such an objection were made
during trial, it would be made in open court during the course
of the public trial. I am unwilling to allow the temporal
factor to control whether the public will be able to have
access to the proceeding.

The Court also must believe that not even the accused
has a right to a public pretrial suppression hearing. For if,
as the Court assumes for the sake of argument, there is a
public right to attend trials that the Sixth Amendment pro-
tects, it is difficult to see why, if that right does not extend
to preliminary proceedings insofar as the public is concerned,
it should extend to such proceedings insofar as the defendant

is concerned. And many of the precedents upon which the Court relies denied a public preliminary proceeding to the accused as well as to the public. *E. g.,* Indictable Offences Act, 11 & 12 Vict., ch. 42, § 17 (1848).

Alternatively, the Court finds that the right to a public trial is the right of the accused only, and that the public has no enforceable interest in public trials. Under this analysis, the defendant—so long as the prosecution and the judge agree—may surely close a full trial on the merits as well as a pretrial suppression hearing. The Court's analysis would thus allow closed trials as well without providing for any standards to insure that "the public['s] . . . right to be informed as to what occurs in its courts" has been protected. *Estes* v. *Texas,* 381 U. S., at 541.

I, for one, am unwilling to allow trials and suppression hearings to be closed with no way to ensure that the public interest is protected. Unlike the other provisions of the Sixth Amendment, the public-trial interest cannot adequately be protected by the prosecutor and judge in conjunction, or connivance, with the defendant. The specter of a trial or suppression hearing where a defendant of the same political party as the prosecutor and the judge—both of whom are elected officials perhaps beholden to the very defendant they are to try—obtains closure of the proceeding without any consideration for the substantial public interest at stake is sufficiently real to cause me to reject the Court's suggestion that the parties be given complete discretion to dispose of the public's interest as they see fit. The decision of the parties to close a proceeding in such a circumstance, followed by suppression of vital evidence or acquittal by the bench, destroys the appearance of justice and undermines confidence in the judicial system in a way no subsequent provision of transcript might remedy. But even where no connivance occurs, prosecutors and judges may have their own reasons for preferring a closed proceeding. And a prosecutor, who seeks to obtain a con-

viction free from error, and a judge who seeks the same while protecting the defendant's rights, may lack incentive to assert some notion of the public interest in the face of a motion by a criminal defendant to close a trial.

## III

At the same time, I do not deny that the publication of information learned in an open proceeding may harm irreparably, under certain circumstances, the ability of a defendant to obtain a fair trial. This is especially true in the context of a pretrial hearing, where disclosure of information, determined to be inadmissible at trial, may severely affect a defendant's rights. Although the Sixth Amendment's public-trial provision establishes a strong presumption in favor of open proceedings, it does not require that all proceedings be held in open court when to do so would deprive a defendant of a fair trial.

No court has held that the Sixth Amendment imposes an absolute requirement that courts be open at all times. On the contrary, courts on both the state and federal levels have recognized exceptions to the public-trial requirement even when it is the accused who objects to the exclusion of the public or a portion thereof. Thus, it is clear that the court may exclude unruly spectators or limit the number of spectators. And in both *Estes* v. *Texas,* 381 U. S. 532 (1965), and *Sheppard* v. *Maxwell,* 384 U. S. 333 (1966), this Court held that a court may place restrictions on the access of the electronic media in particular, and certain types of newsgathering in general, inside the courthouse doors. There are a number of instances where the courts have gone further and upheld the exclusion of the public for limited periods of time. Examples are when it was necessary to preserve the confidentiality of the Government's "skyjacker profile," *United States* v. *Bell,* 464 F. 2d 667 (CA2), cert. denied, 409 U. S. 991 (1972), and when it was necessary to effectuate Congress' determination

that the confidentiality of communications intercepted under Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U. S. C. § 2510 *et seq.,* be preserved prior to the determination that such communications were lawfully intercepted. *United States* v. *Cianfrani,* 573 F. 2d 835 (CA3 1978).

I need express no opinion on the correctness of such decisions. But they illustrate that courts have been willing to permit limited exceptions to the principle of publicity where necessary to protect some other interest. Because of the importance we attach to a fair trial, it is clear that whatever restrictions on access the Sixth Amendment may prohibit in another context, it does not prevent a trial court from restricting access to a pretrial suppression hearing where such restriction is necessary in order to ensure that a defendant not be denied a fair trial as a result of prejudicial publicity flowing from that hearing.[16] See *Branzburg* v. *Hayes,* 408 U. S. 665, 685 (1972).

At the same time, however, the public's interest in maintaining open courts requires that any exception to the rule be narrowly drawn. It comports with the Sixth Amendment to require an accused who seeks closure to establish that it is strictly and inescapably necessary in order to protect the fair-trial guarantee. That finding must be made in the first instance, of course, by the trial court. I cannot detail here

---

[16] This observation is confined to cases where the defendant seeks to close the hearing on the ground that his fair-trial rights will be infringed by an open proceeding. I express no opinion as to whether or when a proceeding subject to the command of the Sixth Amendment may be closed over the objection of the defendant. Nor need I determine what interests other than those of the defendant in a fair trial may support an order of closure. My comments are also confined to rulings within the ambit of the Sixth Amendment's public-trial provision. I thus express no opinion about proceedings, such as those in juvenile court, not otherwise subject to the requirement of the Sixth Amendment. See *McKeiver* v. *Pennsylvania,* 403 U. S. 528, 540–541 (1971) (plurality opinion.)

all the factors to be taken into account in evaluating the defendant's closure request, nor can I predict how the balance should be struck in every hypothetical case. The accused who seeks closure should establish, however, at a minimum the following:

First, he should provide an adequate basis to support a finding that there is a substantial probability that irreparable damage to his fair-trial right will result from conducting the proceeding in public. This showing will depend on the facts. But I think it requires evidence of the nature and extent of the publicity prior to the motion to close in order to establish a basis for the trial court to conclude that further coverage will result in the harm sought to be prevented. In most cases, this will involve a showing of the impact on the jury pool. This seldom can be measured with exactness, but information relating to the size of the pool, the extent of media coverage in the pertinent locality, and the ease with which change of venire can be accomplished or searching *voir dire* instituted to protect against prejudice, would be relevant. The court also should consider the extent to which the information sought to be suppressed is already known to the public, and the extent to which publication of such information, if unknown, would have an impact in the context of the publicity that has preceded the motion to close.

Second, the accused should show a substantial probability that alternatives to closure will not protect adequately his right to a fair trial. One may suggest numerous alternatives, but I think the following should be considered: continuance, severance, change of venue, change of venire, *voir dire,* peremptory challenges, sequestration, and admonition of the jury. ABA Project on Standards for Criminal Justice, Fair Trial and Free Press, Standard 8–3.2, p. 16 (App. Draft 1978). See *Nebraska Press Assn.* v. *Stuart,* 427 U. S., at 562–565; *Sheppard* v. *Maxwell,* 384 U. S., at 354 n. 9, 358–362. One or more of these alternatives may adequately protect the ac-

cused's interests and relieve the court of any need to close the proceeding in advance.[17]

I note, too, that for suppression hearings alternatives to closure exist that would enable the public to attend but that would limit dissemination of the information sought to be suppressed. At most such hearings, the issues concern not so much the contents of a confession or of a wiretap, or the nature of the evidence seized, but the circumstances under which the prosecution obtained this material. Many hearings, with care, could be conducted in public with little risk that prejudicial information would be disclosed.

Third, the accused should demonstrate that there is a substantial probability that closure will be effective in protecting against the perceived harm. Where significantly prejudicial information already has been made public, there might well be little justification for closing a pretrial hearing in order to prevent only the disclosure of details.

I emphasize that the trial court should begin with the assumption that the Sixth Amendment requires that a pre-

---

[17] The Court suggests that the public's interest will be served adequately by permitting delayed access to the transcript of the closed proceeding once the danger to the accused's fair-trial right has dissipated. A transcript, however, does not always adequately substitute for presence at the proceeding itself. Also, the inherent delay may defeat the purpose of the public-trial requirement. Later events may crowd news of yesterday's proceeding out of the public view. "As a practical matter . . . the element of time is not unimportant if press coverage is to fulfill its traditional function of bringing news to the public promptly." *Nebraska Press Assn.* v. *Stuart,* 427 U. S., at 561. Public access is restricted precisely at the time when public interest is at its height. *Bridges* v. *California,* 314 U. S. 252, 268 (1941). Moreover, an important event, such as a judicial election or the selection of a prosecuting attorney, may occur when the public is ignorant of the details of judicial and prosecutorial conduct. Finally, although a record is kept for later release, when the proceeding itself is kept secret, it is impossible to know what it would have been like had the pressure of publicity been brought to bear on the parties during the proceeding itself.

trial suppression hearing be conducted in open court unless a defendant carries his burden to demonstrate a strict and inescapable necessity for closure. There should be no need for a representative of the public to demonstrate that the public interest is legitimate or genuine, or that the public seeks access out of something more than mere curiosity. Trials and suppression hearings by their nature are events of legitimate public interest, and the public need demonstrate no threshold of respectability in order to attend. This is not to say, of course, that a court should not take into account heightened public interest in cases of unusual importance to the community or to the public at large. The prosecution of an important officeholder could intensify public interest in observing the proceedings, and the court should take that interest into account where it is warranted. It is also true, however, that as the public interest intensifies, so does the potential for prejudice.

As a rule, the right of the accused to a fair trial is compatible with the interest of the public in maintaining the publicity of pretrial proceedings. "In the overwhelming majority of criminal trials, pretrial publicity presents few unmanageable threats to this important right." *Nebraska Press Assn.* v. *Stuart,* 427 U. S., at 551. Our cases "cannot be made to stand for the proposition that juror exposure to information about a state defendant's prior convictions or to news accounts of the crime with which he is charged alone presumptively deprives the defendant of due process." *Murphy* v. *Florida,* 421 U. S. 794, 799 (1975). A high level of publicity is not necessarily inconsistent with the ability of the defendant to obtain a fair trial where the publicity has been largely factual in nature, *id.,* at 802; *Beck* v. *Washington,* 369 U. S. 541, 542–545, 557–558 (1962), or where it abated some time prior to trial. See *Stroble* v. *California,* 343 U. S. 181, 191–194 (1952).

In those cases where a court has found publicity sufficiently prejudicial as to warrant reversal on due process grounds, the publicity went far beyond the normal bounds of

coverage. In *Irvin* v. *Dowd,* 366 U. S. 717 (1961), for example, there was a barrage of adverse publicity about the defendant's offer to plead guilty and his confession to several murders and burglaries. In *Rideau* v. *Louisiana,* 373 U. S. 723 (1963), there was live pretrial television coverage of the defendant's confession. And in *Estes* v. *Texas,* 381 U. S. 532 (1965), and *Sheppard* v. *Maxwell,* 384 U. S. 333 (1966), the press, and especially the electronic media, intruded to such an extent on the courtroom proceedings that all semblance of decorum and sobriety was lost. See *Nebraska Press Assn.* v. *Stuart,* 427 U. S., at 551–556; *Murphy* v. *Florida,* 421 U. S., at 798–799.

But "[c]ases such as these are relatively rare." *Nebraska Press,* 427 U. S., at 554. All our decisions in this area, "[t]aken together, . . . demonstrate that pretrial publicity—even pervasive, adverse publicity—does not inevitably lead to an unfair trial." *Ibid.* These cases provide the background against which a trial judge must evaluate a motion to close a hearing on the ground that an open hearing will result in publicity so prejudicial that a defendant will be deprived of his due process right to a fair trial. In *Stroble, Murphy,* and *Beck,* of course, the sharpened vision of hindsight helped the Court to see that the trial had been fair notwithstanding the publicity. The trial judge faced with a closure motion has the more difficult task of looking into the future. I do not mean to suggest that only in the egregious circumstances of cases such as *Estes* and *Sheppard* would closure be permissible. But to some extent the harm that the defendant fears from publicity is also speculative.

If, after considering the essential factors, the trial court determines that the accused has carried his burden of establishing that closure is necessary, the Sixth Amendment is no barrier to reasonable restrictions on public access designed to meet that need. Any restrictions imposed, however, should extend no further than the circumstances reasonably require.

Thus, it might well be possible to exclude the public from only those portions of the proceeding at which the prejudicial information would be disclosed, while admitting to other portions where the information the accused seeks to suppress would not be revealed. *United States* v. *Cianfrani,* 573 F. 2d, at 854. Further, closure should be temporary in that the court should ensure that an accurate record is made of those proceedings held *in camera* and that the public is permitted proper access to the record as soon as the threat to the defendant's fair-trial right has passed.

I thus reject the suggestion that the defendant alone may determine when closure should occur. I also reject any notion that the decision whether to permit closure should be in the hands of the prosecutor on the theory that he is the representative of the public's interest. It is in part the public's interest in observing the conduct of the prosecutor, and the police with whom he is closely associated, that the public-trial provision serves. To cloak his own actions or those of his associates from public scrutiny, a prosecutor thus may choose to close a hearing where the facts do not warrant it. Moreover, prosecutors often are elected, and the public has a strong interest, as noted, in observing the conduct of elected officials. In addition, the prosecutor may fear reversal on appeal if he too strenuously resists the motion of a defendant to close a hearing. Conversely, a prosecutor may wrap in the mantle of the public interest his desire to disseminate prejudicial information about an accused prior to trial, and so resist a motion to close where the circumstances warrant some restrictions on access. I thus am unwilling to commit to the discretion of the prosecutor, against whose own misconduct or incompetence the public-trial requirement is designed in part to protect, the decision as to whether an accused's motion to close will be granted.

As a final safeguard, I would conclude that any person removed from a court should be given a reasonable opportunity to

state his objections prior to the effectiveness of the order. This opportunity need not take the form of an evidentiary hearing; it need not encompass extended legal argument that results in delay; and the public need not be given prior notice that a closure order will be considered at a given time and place. But where a member of the public contemporaneously objects, the court should provide a reasonable opportunity to that person to state his objection. Finally, the court should state on the record its findings concerning the need for closure so that a reviewing court may be adequately informed.

## IV

The Sixth Amendment, in establishing the public's right of access to a criminal trial and a pretrial proceeding, also fixes the rights of the press in this regard. Petitioner, as a newspaper publisher, enjoys the same right of access to the *Jackson* v. *Denno* hearing at issue in this case as does the general public. And what petitioner sees and hears in the courtroom it may, like any other citizen, publish or report consistent with the First Amendment. "Of course, there is nothing that proscribes the press from reporting events that transpire in the courtroom." *Sheppard* v. *Maxwell*, 384 U. S., at 362–363. Reporters for newspaper, television, and radio "are entitled to the same rights as the general public" to have access to the courtroom, *Estes* v. *Texas*, 381 U. S., at 540, where they "are always present if they wish to be and are plainly free to report whatever occurs in open court through their respective media." *Id.*, at 541–542. "[O]nce a public hearing ha[s] been held, what transpired there could not be subject to prior restraint." *Nebraska Press Assn.* v. *Stuart*, 427 U. S., at 568.

Petitioner acknowledges that it seeks no greater rights than those due the general public. But it argues that, the Sixth Amendment aside, the First Amendment protects the free flow of information about judicial proceedings, and that this flow may not be cut off without meeting the standards required to

justify the imposition of a prior restraint under the First Amendment. Specifically, petitioner argues that the First Amendment prohibits closure of a pretrial proceeding except in accord with the standards established in *Nebraska Press* and only after notice and hearing and a stay pending appeal.

I do not agree. As I have noted, this case involves no restraint upon publication or upon comment about information already in the possession of the public or the press. It involves an issue of access to a judicial proceeding. To the extent the Constitution protects a right of public access to the proceeding, the standards enunciated under the Sixth Amendment suffice to protect that right. I therefore need not reach the issue of First Amendment access.

## V

I return to the exclusion order entered by Judge DePasquale. It is clear that the judge entered the order because of his apparent concern for the fair-trial rights of the defendants and his suspicion that those rights would be threatened if the hearing were public. I acknowledge that concern, but I conclude that the order was not justified on the facts of this case.

There was no factual basis upon which the court could conclude that a substantial probability existed that an open proceeding would result in harm to the defendants' rights to a fair trial. The coverage in petitioner's newspapers of Clapp's disappearance and the subsequent arrest and prosecution of Greathouse and Jones was circumspect. Stories appeared on only 7 of the 18 days between July 20 and August 6. All coverage ceased on August 6 and did not resume until after the suppression hearing three months later. The stories that appeared were largely factual in nature. The reporting was restrained and free from editorializing or sensationalism. There was no screaming headline, no lurid photograph, no front-page overemphasis. The stories were of moderate length and were linked to factual developments in the case. And

petitioner's newspapers had only a small circulation in Seneca County. See n. 1, *ante,* of the Court's opinion.

In addition, counsel for respondents stated that the only fact not known to petitioner prior to the suppression hearing was the content of the confessions. Tr. of Oral Arg. 40. Prior to the hearing, petitioner had learned of the confessions and of the existence and nature of the physical evidence sought to be suppressed. It is thus not at all likely that the openness of the suppression hearing would have resulted in the divulgence of additional information that would have made it more probable that Greathouse and Jones would be denied a fair trial.

On this record, I cannot conclude, as a matter of law, that there was a sufficient showing to establish the strict and inescapable necessity that supports an exclusion order. The circumstances also would not have justified a holding by the trial court that there was substantial probability that alternatives to closure would not have sufficed to protect the rights of the accused.

It has been said that publicity "is the soul of justice." J. Bentham, A Treatise on Judicial Evidence 67 (1825). And in many ways it is: open judicial processes, especially in the criminal field, protect against judicial, prosecutorial, and police abuse; provide a means for citizens to obtain information about the criminal justice system and the performance of public officials; and safeguard the integrity of the courts. Publicity is essential to the preservation of public confidence in the rule of law and in the operation of courts. Only in rare circumstances does this principle clash with the rights of the criminal defendant to a fair trial so as to justify exclusion. The Sixth and Fourteenth Amendments require that the States take care to determine that those circumstances exist before excluding the public from a hearing to which it otherwise is entitled to come freely. Those circumstances did not exist in this case.